896 A.2d 973

**STATE of Maryland**

v.

**Tony WILLIAMS.**

**No. 97 Sept. Term, 2003.**

Court of Appeals of Maryland.

April 14, 2006.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, Baltimore), on brief, for Petitioner.

Robert W. Biddle (Nathans & Biddle, L.L.P., Baltimore), on brief; Fred Warren Bennett (Bennett & Lawlor, L.L.P., Greenbelt), on brief, for Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, GREENE and JOHN C. ELDRIDGE (Retired, specially assigned), JJ.

BELL, Chief Judge.

In this case, we are asked whether *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its application pursuant to Maryland Rule 4–263(g),[1] extend not only to exculpatory or mitigating information pertaining to State's witnesses known by the Assistant State's Attorney prosecuting a specific criminal case and the related officers participat-

---

1. Maryland Rule 4–263(g) provides:
   "(g) Obligations of State's Attorney. The obligations of the State's Attorney under this Rule extend to material and information in the possession or control of the State's Attorney and staff members and any others who have participated in the investigation or evaluation of the action and who either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney."

ing in that prosecution, but also to such information known to the other Assistant State's Attorneys in the same office. We shall hold that Rule 4–263(g) requires that result. Furthermore, as did the Court of Special Appeals, *Williams v. State,* 152 Md.App. 200, 831 A.2d 501 (2003), we believe that, under the circumstances of this case, *Brady* does indeed extend beyond the individual prosecutor, encompassing exculpatory or mitigating information known to any prosecutor in the office.

The United States Supreme Court, in *Brady,* held that the Due Process Clause of the United States Constitution imposes upon the State a duty and obligation to disclose "evidence favorable to an accused upon request ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1197, 10 L.Ed.2d at 218. *See also Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40, 57 (1987). The evidence to which the Court referred was both exculpatory evidence and impeachment evidence. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 (1972). *See also United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 490 (1985). The duty to disclose such evidence also applies whether or not there has been a request for such evidence by the accused. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342, 351 (1976).

The State in the case *sub judice* essentially presents three arguments, each of which, it maintains, requires reversal of the judgment of the Court of Special Appeals. First, it claims that the net cast by *Brady* does not, in fact, reach evidence beyond the personal knowledge of the individual prosecutor in a case, without regard to the ease with which the prosecutor may have been able, with due diligence, to obtain such evidence from other sources. Second, it claims that, even if *Brady* applies to such evidence, the State's failure to disclose it is excused, or negated, by the defendant's ongoing discovery duty. Third, the State argues that the evidence that was not disclosed in this case was not material, and, therefore, was

unlikely to have affected the decision rendered at the trial level; that, in other words, it was "harmless error." With all these points, we disagree.

## A.

Having mandated in *Brady*, that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," 373 U.S. at 87, 83 S.Ct. at 1197, 10 L.Ed.2d. at 218, the Supreme Court has outlined the three elements of a *Brady* violation. *Strickler v. Greene*, 527 U.S. 263, 281–282, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286, 302 (1999). The Court has explained: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. at 281–282, 119 S.Ct. at 1948, 144 L.Ed.2d at 302. With this in mind, we turn to the facts of this case.

The respondent, Tony Williams, was charged with, and convicted in the Circuit Court for Baltimore City of, the murder of Dana Rochelle Drake, who was fatally shot outside her apartment in northeast Baltimore, and related offenses. Central to the State's case against the respondent was the testimony of Sean Williams ("S. Williams"), a jailhouse snitch. S. Williams, who had occupied a cell adjacent to the one occupied by the respondent when the respondent was being held on the murder charge at the Baltimore City jail, testified that the respondent admitted committing the murder. According to S. Williams, at that time, the respondent also admitted purchasing the murder weapon. The motive for the crime was, he said, the respondent's desire to collect the proceeds of the life insurance policy he had taken out on Ms. Drake's life. S. Williams testified that he reported this information to homicide detectives, including an Officer Massey, who recorded his statement. He stated that he was promised nothing in exchange for the information and, furthermore, had

not asked for anything. Thus, S. Williams maintained that he was getting "nothing" "out of this thing," and that no one in the State's Attorney's Office promised him anything or initiated contact with him about the case. In short, according to S. Williams, his testimony was being given "out of the goodness of his heart" and because he did not like guns and violence. The respondent's convictions were reversed by the Court of Special Appeals. *Williams v. State*, 152 Md.App. 200, 831 A.2d 501 (2003).

Although unknown to the prosecuting attorney, S. Williams was, and had been, for at least 10 years, a paid and registered police informant fo. the Baltimore City Police Department, Eastern District Drug Unit, with his own confidential informant number.[2] Moreover, he had cooperated with the State's Attorney's Office in a number of cases, involving narcotics, weapons and homicide, leading to numerous arrests. That S. Williams was a confidential informant, with an identification number, and was cooperative in narcotics cases, was known to at least one member of the Baltimore City State's Attorney's Office and also, perhaps more extensively, to members of the Baltimore City Police Department.

When the respondent was arrested and charged with the Drake murder,[3] S. Williams had been charged with theft of both a battery and a police cruiser from the Eastern District Police District. Those charges were disposed of in consider-

---

2. The officer who registered S. Williams as a confidential paid informant testified that because the identities of confidential informants were not centrally computerized, S. Williams's status as a police informant, while known to some, was not known to all police officers in the Eastern District

3. The Court of Special Appeals' opinion states that the charges against respondent were lodged in the Spring of 1998. The respondent maintains, on the other hand, that the charges were brought in the latter part of 1997. Since the murder was alleged to have been committed in February, 1998, the respondent was charged in the Spring of 1998 and is alleged to have made the admissions to S. Williams while in the Baltimore City jail on the murder charge and S. Williams reported them to Officer Massey in March, 1998, it is likely that the respondent's version is more accurate.

ation of S. Williams's cooperation in drug arrests. His handler, the officer who registered him, so testified. That testimony was confirmed by S. Williams's attorney in the theft case and by the prosecutor in that case. In fact, the prosecutor testified that it was because of S. Williams's cooperation in narcotics cases that he "stetted" the cruiser theft charge. For the battery theft charge, he was sentenced to "time served."

The case folder in the S. Williams's theft case contained other corroborative evidence. A notice of postponement indicated that the "defense wishes to cooperate [with the Baltimore City Police Department] and others on pending cases." In addition, the stet noted that it was entered because the "State declines to prosecute."

Although the prosecuting attorney in the respondent's case and homicide detective Massey testified that they did not know of S. Williams's informant status and denied "giving him anything" for his testimony—Massey even indicated that S. Williams never asked for anything in exchange for the information he provided—the case file in an earlier case involving S. Williams suggested that S. Williams had a different mindset, that he wanted, and had actively sought, consideration for his cooperation. S. Williams had earlier been sentenced to twenty-one months and five days for possession of cocaine. There were nine letters in the file, each written by S. Williams to the sentencing judge in that case, informing the sentencing judge that he was an informant for the Baltimore City Police Department and touting his cooperation with his handler, and "the prosecutor." In those letters, S. Williams asked for leniency in exchange for his cooperation. In four of the letters, his cooperation with homicide officers was emphasized. In the letter postmarked August 12, 1998, mentioning Officer Massey, he told the judge, "I have been very helpful to officers in Homicide since my arrest, I have told them very important things in cases that are to be tryed [sic] soon." In two subsequent letters, he referenced the respondent's case, a murder case "which involved a man who killed his fiancee, to obtain a very lump some [sic] of a life insurance," advising the sentencing judge in one of the letters that he was the "key

witness" and informing him in the other that he had just testified. In both letters he mentioned again Officer Massey.

The sentencing judge responded to S. Williams on two occasions, sending copies to "the State's Attorney's Office," rather than to a particular assistant. In one of the responses, the judge told S. Williams to have his attorney contact the detective who registered him "and [to] have [his] attorney or the Detective contact this office to inform the Judge of any help you are giving him."

Having learned of the preceding facts, the respondent filed a post conviction petition, based on newly discovered evidence. The newly discovered evidence was, he alleged, that the State had failed to disclose impeachment information regarding S. Williams, its primary and star witness, including that he was, and had a record of being, a paid informant. The respondent argued that without this information, his cross-examination of the "jailhouse snitch" at trial was severely and prejudicially weakened.

As indicated, the prosecuting attorney testified that she had not made any "offers of leniencies or provided any benefit to Sean Williams in exchange for his testimony in the Tony Williams case." Moreover, she denied speaking with the prosecutor who prosecuted S. Williams and, therefore, was aware neither of the charges lodged against him nor of their disposition.

The post conviction court denied the respondent's petition for post conviction relief. Perceiving the question to be whether the knowledge possessed by a prosecutor in the General Felony Division of the Baltimore City State's Attorney's Office is imputed to a homicide prosecutor in the same office, but in a different location and a different division, it answered "no," concluding that "under *Brady* and Maryland Rule 4–263(g), the State's duty did not extend to information held by another prosecutor within the same prosecutor's office who, at all times, was wholly unconnected to the case at issue." The court reasoned that, while it "seems fair and appropriate for the State to be required to disclose to defense counsel all

exculpatory information in its hands, including all evidence which goes toward impeachment of a State witness, both in its files and the files of the police and of all other agencies who have reported on the case to the State's Attorney's Office and who have participated in the case as a part of the prosecution case," a rule that would extend the disclosure duty on the prosecution to information possessed by those who neither has ever reported to the prosecution or directly worked on the case would be too broad. "Th[e] Court d[id] not believe such construction would be appropriate, practical or would enhance the administration of justice."

## B.

At the Court of Special Appeals, the respondent conceded that the particular Assistant State's Attorney in his case had not been aware of S. Williams's status as an informant. The respondent contended, however, that, under *Brady*, the obligation to disclose information relating to the credibility of a witness extended beyond the knowledge of the particular prosecutor, to all of that prosecutor's colleagues within the same office. Further, the respondent argued that Maryland Rule 4–263(g) applies to all prosecutors in the same office, whether or not assigned to, or working on, the case. Thus, the respondent argued that, because S. Williams was the State's critical witness, "[the State] should at the very least be required to perform due diligence within the same prosecutor's office to verify such claims." *Williams v. State,* 152 Md.App. at 218, 831 A.2d at 511. Finally, the respondent maintained that S. Williams's testimony was material. He noted, in support, the lack of forensic evidence and the circumstantial nature of the rest of the State's case. He believed, and therefore submitted, that there was a reasonable probability [4] that the verdict would have been different if S. Williams's status as an informant had been disclosed.

---

4. The correct standard is "reasonable possibility," a standard articulated by this Court in *Dorsey v. State* to determine whether improperly admitted evidence contributed to a conviction applies. 276 Md. 638,

The State, not unexpectedly, agreed with the post conviction court's more limited reading of *Brady* and Maryland Rule 4–263(g). The State further contended that S. Williams's information was not material since his credibility was sufficiently "attacked" on cross-examination.

In deciding this case, the Court of Special Appeals first established that, pursuant to *Giglio,* when the reliability of a State witness is determinative of the defendant's guilt or innocence, the State's failure to disclose impeachment evidence falls within *Brady.* 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108. It agreed with the respondent that when applied to his case, *Giglio,* required that "[t]he prosecutor's office [be treated as] an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Williams,* 152 Md.App. at 224, 831 A.2d at 515, *quoting Giglio,* 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 109. The intermediate appellate court also was persuaded that, "[t]o the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Id.* Indeed, it observed:

---

350 A.2d 665 (1976) (holding that the reviewing court must thus be satisfied that there is no reasonable possibility that evidence complained of, whether erroneously admitted or excluded, may have contributed to rendition of guilty verdict). *See also Yorke v. State,* 315 Md. 578, 556 A.2d 230 (1989) (in regards to newly discovered evidence, favoring a standard that falls between "probable," which is less demanding than "beyond a reasonable doubt," and "might" which is less stringent than probable, and establishing that the inquiry is whether there is a "possibility that the verdict of the trier of fact would have been affected") (emphasis added); *Bowers v. State,* 320 Md. 416, 425–427, 578 A.2d 734, 738–739 (1990) (holding that, in defining the reasonable probability language in *Strickland* with more precision, substantial possibility describes the prejudice standard in *Strickland*); *Gross v. State,* 371 Md. 334, 347, 809 A.2d 627, 635 (2002) (holding regarding Sixth Amendment prejudice, "[i]f there is no reasonable possibility that the appellate court would have ruled in his favor, there can be no *Strickland* prejudice").

"When, as here, there is an obvious basis to suspect the motives and credibility of a proposed witness for the State, it may be incumbent upon the State's Attorney, in an office with many Assistant State's Attorneys, to establish a procedure to facilitate compliance with the obligation under *Brady* to disclose to defense material that includes information 'casting a shadow on a government witness's credibility[.]' "

*Williams,* 152 Md.App. at 225, 831 A.2d at 515, *citing United States v. Bernal–Obeso,* 989 F.2d 331, 334 (9th Cir.1993).

The Court of Special Appeals believed that the State's Attorney's Office had been put on notice that S. Williams was seeking a reward in exchange for his testimony and cooperation in homicide and narcotics cases. It adopted the rationale enunciated by the Ninth Circuit Court of Appeals in *Bernal–Obeso,* that a material lie by an informant about his prior record is exculpatory within the meaning of *Brady.* In *Bernal–Obeso,* the court explained:

"By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom.... By its actions, the government can either contribute to or eliminate the problem. Accordingly we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery. This responsibility includes the duty as required by *Giglio* to turn over to the defense in discovery *all* material information casting a shadow on a government witness's credibility."

989 F.2d at 333–334. Therefore, to the Court of Special Appeals, although the prosecutor did not know that S. Williams was a paid informant, it was significant that she *did* know that he was an incarcerated man coming forward "out of the goodness of his heart." That knowledge "should [have] give[n] even the most unseasoned prosecutor pause as to the

informant's true motives." 152 Md.App. at 224, 831 A.2d at 514.

Having determined that the State failed to discharge its *Brady* obligation to disclose information favorable to the respondent, the intermediate appellate court turned to, and addressed, the materiality of the withheld information. It concluded that "the taint of the *Brady* suppression matters on this record so undermines our confidence in the murder conviction that a new trial is in order." 152 Md.App. at 227, 831 A.2d at 516, *citing Conyers v.State*, 367 Md. 571, 613, 790 A.2d 15, 40 (2002), *cert. denied*, 537 U.S. 942, 123 S.Ct. 341, 154 L.Ed.2d 249 (2002).

We granted the State's petition for writ of certiorari, *State v. Williams*, 378 Md. 617, 837 A.2d 928 (2003), to address this important issue.

## C.

Maryland Rule 4–263(g) clearly mandates, and requires, that the duty to disclose materials and information applies not only to those prosecuting or actively participating in the case, but also to any and all members of the State's Attorney's Office, attorneys and staff. Rule 4–263(g) states, in its entirety:

> "The obligations of the State's Attorney under this Rule extend to material and information in the possession *of the State's Attorney and staff members* and any others who have participated in the investigation or evaluation of the action and who either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney."

Md. Rule 4–263(g) (emphasis added).

■ The canons of rule construction and interpretation are well settled and frequently stated. "To interpret rules of procedure, we use the same canons and principles of construction used to interpret statutes." *State ex rel. Lennon v. Strazzella*, 331 Md. 270, 274, 627 A.2d 1055, 1057 (1993). *See Jones v. Hubbard*, 356 Md. 513, 526, 740 A.2d 1004, 1011

(1999) ("the canons of statutory construction are also generally applicable in respect to rule construction"); *State v. Bell,* 351 Md. 709, 717, 720 A.2d 311, 315 (1998); *State v. Harrell,* 348 Md. 69, 79, 702 A.2d 723, 728 (1997) ("In construing a rule, we apply principles of interpretation similar to those used to construe a statute"); *In re Victor B.,* 336 Md. 85, 94, 646 A.2d 1012, 1016 (1994) ("We have repeatedly stated that the canons and principles we follow in construing statutes apply equally to an interpretation of our rules"); *State v. Montgomery,* 334 Md. 20, 24, 637 A.2d 1193, 1195 (1994) ("The canons and rules of construction that guide the interpretation of statutes apply equally when interpreting rules of procedure.").

In *Strazzella,* 331 Md. at 274–75, 627 A.2d at 1057, we articulated:

> "In our effort to discern the meaning of a rule, we look first to the words of the rule. When the words are clear and unambiguous, ordinarily we need not go any further.... Only when the language of the rule is ambiguous is it necessary that we look elsewhere to ascertain legislative intent.... We are also to give effect to the entire rule, neither adding, nor deleting, words in order to give it a meaning not otherwise evident by the words actually used.... Finally, we seek to give the rule a reasonable interpretation, not one that is illogical or incompatible with common sense...."

(citations omitted). *See Blundon v. Taylor,* 364 Md. 1, 7–8, 770 A.2d 658, 661–662 (2001); *see also Mayor and City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987, 991 (2000); *Chesapeake and Potomac Tel. Co. of Maryland v. Director of Finance for Mayor and City Council of Baltimore,* 343 Md. 567, 578–79, 683 A.2d 512, 517–18 (1996).

Moreover, the rule is read so that "no word, phrase, clause or sentence is rendered surplusage or meaningless." *Montgomery County v. Buckman,* 333 Md. 516, 524, 636 A.2d 448, 452 (1994); *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753, 755 (1993); *Prince George's Co. v. White,* 275 Md. 314, 319, 340 A.2d 236, 240 (1975). "Where the words of a statute,

construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning," the court will give effect to the rule as written. *Design Kitchen & Baths v. Lagos*, 388 Md. 718, 728, 882 A.2d 817, 823 (2005), *citing Moore v. Miley*, 372 Md. 663, 677, 814 A.2d 557, 566 (2003). Thus,

> "when the statutory language is plain and unambiguous, a court may neither add nor delete language so as to 'reflect an intent not evidenced in that language,' ... nor may it construe the statute with ' "forced or subtle interpretations" that limit or extend its application.' "

*Design Kitchen & Baths*, 388 Md. at 729, 882 A.2d at 823–824.

So read, it is clear from the language used by the rule that the obligations of the State's Attorney to disclose encompasses three groups: the State's Attorney, his or her staff members, and those who are not either of the foregoing, but who have participated, or are participating, in the case itself, by, for example, participating "in the investigation or evaluation of the action," regularly reporting to the State's Attorney's Office, or, with respect to the case under review, have reported to the State's Attorney's Office. This is made clear by the fact that no distinction is drawn between attorneys and staff working on the subject case and those that are not, and by the use of the word "and" to separate the terms "State's Attorney" and "staff members" from each other and from the remainder of the sentence. In context, the reference to simply "State's Attorney," rather than to "Assistant State's Attorneys," is to the Office, as an entity, i.e., to all of the attorneys in that office. Similarly, in context, "staff members" must refer to all support personnel, i.e. secretaries, paralegals and other personnel, in the State's Attorney's Office. The use of "and," rather than separating each specific category with a comma, indicates that the group, on either side of the conjunction, stands alone and is not a part of a series connected by a common characteristic.

Aside from the punctuation, the words used to introduce the category of persons who are not a part of the State's attor-

ney's office are not consistent with a series of related persons. "Any others," followed by the applicable qualifiers, far from denoting a continuing series, introduces additional persons who are covered, but only if they qualify on the bases then subsequently .enumerated, which bases need not be the same as qualified the earlier enumerated categories.

The State argues the contrary, that Maryland Rule 4–263(g) must be construed more narrowly. Focusing on the rule's last phrase, "any others who have participated in the investigation or evaluation of the action and who either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney," it submits that these qualifiers apply with equal force to "State's Attorney" and "staff member," that this Court intended only those prosecutors and staff members who were, or had been, involved with the case to fall within the rule's prescription.

This narrow reading is not supported by the language of the rule. For the State's interpretation to be the correct one, or even plausible, at the very least, a comma, rather than the word "and" would have had to have been inserted between the words "State's Attorney" and "staff members." Even then, the words, "any others," would have to be explained; those words suggest a separateness. By their use, as we have indicated, there is introduced a new category of affected persons, rather than a continuation of a series bound together by a common characteristic. In addition, for the State's interpretation to be a proper one, the meaning of the words, "State's Attorney" and "staff members" would have to be expanded by reading them as "Assistant State's Attorneys" and staff members "working on, or that have worked on," the particular action. That requires adding words and, thus, giving the Rule a meaning not evident from the words actually used.

We hold that by referring only to the "State's Attorney and staff members," without any restriction, and then including "any others," restricted to those with a direct present or past involvement with the particular action, Rule 4–263(g) draws a

distinction between the State's Attorney's Office and those outside that Office who are on the prosecution team. The latter category falls within the *Brady* rule only if those persons have or have had involvement with the action at issue or regularly reports to the State's Attorney's Office. No such limitation applies to the attorneys and staff in that Office. As to them, the *Brady* obligation extends to material and information in their possession. Thus, where, as in the case *sub judice,* the information regarding S. Williams's status as an informant was known to another attorney in the State's Attorney's Office, the Rule compels its disclosure.

## D.

■ *Brady* also mandates that, under the circumstances of this case, the State's duty and obligation to disclose exculpatory and mitigating material and information extend beyond the individual prosecutor and encompass information known to any prosecutor in the office. Generally, *Brady* violations cover a variety of prosecutorial transgressions involving the breach of the duty to disclose exculpatory evidence. *Strickler,* 527 U.S. at 280, 119 S.Ct. at 1948, 144 L.Ed.2d at 301. These transgressions include both the failure to search for, and the failure to produce, such evidence. *In re Sealed Case,* 337 U.S.App.D.C. 332, 185 F.3d 887, 892 (D.C.Cir.1999).

■ When the core of the State's argument relies on the testimony of an essential witness, the State has a duty to discover anything, and everything, that concerns that witness's credibility and, thus, potential for impeachment. The State admits that, under *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108, when the reliability of a witness is determinative of guilt or innocence, nondisclosure of such evidence falls within *Brady.* In that case, where the entire State's case relied upon the credibility of the testimony of a key State witness; the Supreme Court held that "evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility." 405 U.S. at 154–155, 92 S.Ct. at 766, 31 L.Ed.2d at 108. *See also Ware v. State,* 348

Md. 19, 41, 702 A.2d 699, 710 (1997) ("[T]he prosecutor's duty to disclose applies to any understanding or agreement between the witness and the State").

Essential to the inquiry into whether a *Brady* violation has occurred is the determination of who has the obligation to disclose and of what that obligation consists. The State's main contention, disagreeing with the Court of Special Appeals, is that *Brady* and its progeny do not extend the disclosure obligation to information possessed by *all* prosecutors working in the same office. We disagree with the State. We hold that the disclosure obligation imposed by *Brady* does, in fact, apply to information possessed by other prosecutors in the same office.

In *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490, 508 (1995), to be sure, the Supreme Court held that the *Brady* disclosure obligation includes information "known only to police investigators and not to the prosecutor." Therefore, the Court pointed out, in order to comply with *Brady,* "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Id.* at 437, 115 S.Ct. at 1567, 131 L.Ed.2d at 508. This does not address, and certainly does not require, that prosecutors in the same office be insulated from the *Brady* disclosure requirement depending on whether they have had any involvement in a particular case.

In *Giglio,* defense counsel asked a State's witness on cross-examination if any promises of leniency had been made, and the witness falsely answered no. 405 U.S. at 151–152, 92 S.Ct. at 765, 31 L.Ed.2d at 107. The prosecution misrepresented that no such promises had been made, even though one had been. 405 U.S. at 152, 92 S.Ct. at 765, 31 L.Ed.2d at 107. The Defendant moved for a new trial based upon this newly discovered information. 405 U.S. at 152, 92 S.Ct. at 765, 31 L.Ed.2d at 107. The Supreme Court rejected the contention that, because the attorney who had made the deal did not report it to his superiors or coworkers, *Brady* did not apply.

405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 109. Instead, the Court held, "[t]he prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 109.

The State acknowledges that the nondisclosure that occurred in *Giglio* deprived the defendant of a fair trial. Nevertheless, relying on the following excerpt from *Giglio,*

> "We do not . . . automatically require a new trial whenever a 'combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict,'"

405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108, it argues that a new trial is unwarranted. This does not explain why prosecutors within the same office do not come within the purview of *Brady.* If anything, *Giglio* compels a more careful probing of all the ˜˜es within the prosecutor's office during discovery in order to avoid later discovery of outcome-affecting, if not determinative, evidence.

In *In re Sealed Case,* 185 F.3d 887 (D.C.Cir.1999), a District of Columbia police officer applied for a warrant to search the home of the defendant, based on informant information that guns and ammunition were present within the home. 185 F.3d at 889. The warrant was executed, guns and ammunition were found, and the defendant was arrested. 185 F.3d at 889. The defendant was charged in federal court with unlawful possession of a firearm and ammunition by a convicted felon.

At trial, the defendant sought to discover the identity of the informant, as well as any *Brady* information concerning promises made to this informant. 185 F.3d at 889. After this request was denied, the informant, a friend of the defendant's, came forward and admitted to the defendant's attorney's investigator that he was working for the government in the federal case in order to get a deal in his own criminal case that was pending in D.C. Superior Court. 185 F.3d at 890. Defense counsel moved for disclosure of information about the

witness's sealed cases and cooperation agreements respecting those cases. That request was denied. 185 F.3d at 891. The government believed, and therefore argued, that the cooperation agreements in the sealed cases involving government witnesses were not within the purview of *Brady*, presumably because, despite being prosecuted by attorneys from the same office, they were made in connection with and involved a case separate from the one as to which they were being sought, and the case to which they applied was in a separate level of court. Thus, it argued the agreements were not required to be disclosed. 185 F.3d at 891. The trial court agreed. 185 F.3d at 891. The United States Court of Appeals for the District of Columbia Circuit, however, rejected the argument. 185 F.3d at 896. It explained:

> "We find equally unfounded the argument that any agreements [the informant] may have had in his Superior Court cases 'don't have anything to do with this case.' ... Defendant's whole point was that [the informant] may have planted the gun in this case in order to 'work off' obligations that arose in those Superior Court cases. Hence, agreements in the other cases have everything to do with this case. *Nor does it matter that agreements in other cases may have involved other prosecutors. The United States Attorney's Office for the District of Columbia prosecutes cases in both the federal District Court and the local Superior Court, and the prosecutor is responsible (at a minimum) for all Brady information in the possession of that office.*
>
> * * * *
>
> "For a similar reason, we reject as irrelevant the contention that the requested records may have been in the possession of the Metropolitan Police Department, or the FBI or DEA, rather than the U.S. Attorney's Office. As the Supreme Court held in *Kyles,* 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' ... Anticipating *Kyles,* we specifically held in *United States v. Brooks*[, 296 U.S.App.D.C. 219, 966 F.2d 1500 (1992)] that prosecutors in this District are responsible for disclosing

Brady information contained in MPD files, 'given the close working relationship between the Washington metropolitan police and the U.S. Attorney for the District of Columbia (who prosecutes both federal and District crimes, in both the federal and Superior courts).' ... The same is true for files of the FBI and DEA which, like the U.S. Attorney's Office, are components of the U.S. Department of Justice...."

185 F.3d at 896 (citations omitted) (emphasis added). Thus, it mattered little that the undisclosed information came from a different level of trial court in a different case; because the prosecuting attorneys came from the same office, *Brady* applied.

Some federal courts have held that, in reference to offices and other involved persons *outside* of the prosecutor's office, *Brady* applies according to one's participation level. *United States v. Eley*, 335 F.Supp. 353 (N.D.Ga.1972), supports this proposition:

"It should also be pointed out that the *Brady* duty affects not only the office of the United States Attorney in Atlanta, but also any other investigative agencies of the Government which have gathered information as part of the case of the prosecution against the accused who seeks disclosure. Thus if the Bureau of Narcotics and Dangerous Drugs or the Federal Bureau of Investigation have participated in the case and have in their possession information which may be favorable to the accused, it must be disclosed to him.... Of course, the prosecutor has no duty to disclose information in the possession of governmental agencies which are not investigative arms of the prosecution and have not participated in the case, even if such information might be helpful to the accused...."

335 F.Supp. at 358 (citations omitted).

As another example, in *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842 (4th Cir.1964), the court opined:

"[T]he effect of the nondisclosure [is not] neutralized because the prosecuting attorney was not shown to have had

knowledge of the exculpatory evidence. Failure of the police to reveal such material evidence in their possession is equally harmful to a defendant whether the information is purposely, or negligently, withheld. And it makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure.... If the police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant. 'The cruelest lies are often told in silence.' If the police silence as to the existence of the reports resulted from negligence rather than guile, the deception is no less damaging...."

331 F.2d at 846.

The main disagreement we have with the State is the State's attempt, as the post conviction court did, to bring the participation requirement, which plainly applies to actors outside the State's Attorney's Office, into the prosecutor's office itself. The State would require that, in order for *Brady* to apply, both persons outside of the prosecutor's office and those within the office must possess some involvement link to the case at hand.

The State suggests that case law from other jurisdictions supports this interpretation. Upon our review of the cases it cites, however, we believe the State's reliance to be misplaced. The State cites first to three Massachusetts cases: *Commonwealth v. Daye*, 411 Mass. 719, 587 N.E.2d 194 (1992), *Commonwealth v. Tucceri*, 412 Mass. 401, 589 N.E.2d 1216 (1992), and *Commonwealth v. Sleeper*, 435 Mass. 581, 760 N.E.2d 693 (2002). Each of these cases involves an office outside of the prosecutor's office, or persons not in that office, and the applicability of *Brady* is based on the subject office's or person's participation, or lack thereof, in the subject prosecution. These cases stand for the proposition that persons outside of the prosecutor's office must be involved in the

prosecution of the case at issue in order that the disclosure obligation under *Brady* apply to them. We reject, however, the State's use of these cases to imply that such a participation requirement equally applies within a prosecutor's office; they clearly do not stand for that conclusion.

In *Daye,* a murder case, the defense argued that the Essex County District Attorney failed to disclose investigatory evidence held by Boston police officers, a separate county, regarding possibly related murders. Despite the arguments made by the defense that the two counties were acting jointly, the Massachusetts court held "[w]e have examined the record and we are satisfied that it does not warrant the conclusion that a joint investigation was conducted.... Nothing in the record suggests that the prosecutor in this case has access to the Boston police department files." 587 N.E.2d at 203. The court then refused to impute the knowledge of the Boston police to the Essex County District Attorney.

*Daye,* the State contends, stands for the proposition that, for *Brady* purposes, information possessed by police officers could only be imputed to the prosecutor if the police officers were involved with the case and, thus, under similar logic, individuals within the prosecutor's office, including other prosecutors within that office, are held to the same standard. We disagree. The circumstances surrounding this case are different than in *Daye;* in this case, the information was not possessed by someone outside the State's Attorney's Office, but, instead, by another prosecutor within the same office. Moreover, the *Daye* court's refusal to impute information in the possession of persons acting outside of the prosecutor's office, and not involved with the case, to those in the office, who were involved, is not inconsistent with our reading of Maryland Rule 4–263(g).

The other two Massachusetts cases, *Tucceri* and *Sleeper,* do little to support the State's position. In *Tucceri,* the State failed to disclose photographs that were taken of the defendant at the time of his arrest by the Cambridge police department. While acknowledging that new trials should not

be granted unless there are substantial reasons for doing so, the *Tucceri* court agreed that the nondisclosure of the photographs was enough to warrant a new trial, and took the opportunity to comment:

> "[P]rosecutors, who are agents of the State and often have access to information that defendants may not have, should be encouraged to disclose exculpatory evidence that in fairness defendants should have for their defense. Of course, a prosecutor cannot always know that a particular piece of evidence is or might be exculpatory. A rule that encourages prosecutors to make pretrial disclosures of obviously or even arguably exculpatory material would not only promote fair trials but would also help avoid the difficulties of post-trial judicial review."

*Tucceri*, 589 N.E.2d at 1219–1220.

Pursuant to this clearly iterated perspective, the separate but limited proposition for which the State cites *Tucceri*, that "[a] prosecutor's duty ... extends only to exculpatory evidence in the prosecutor's possession or in the possession of the police who participated in the investigation and presentation of the case," does not require the interpretation that the State gives it. Given the context, the *Brady* obligation quite clearly and unmistakeably applied to the Cambridge police because they were involved in the defendant's arrest and investigation. It does not shed any light on the level of involvement in the case required of individual prosecutors in the same office and it certainly does not reject the concept of a prosecutor's office being an entity. In fact, we read the word, "prosecutor," as used by the *Tucceri* court, to refer to the prosecution as an entity, and not as an individual. At best for the State, the term is ambiguous.

In *Sleeper*, another murder case, the State did not disclose that one of its witnesses, a psychiatrist, had a history that included charges of sexual misconduct. Arguing that *Brady* compelled the disclosure of this evidence as impeachment evidence, the defendant moved for a new trial. The Supreme Judicial Court concluded that the psychiatrist who testified for

the State was not a "member of the prosecution team" and, thus, was under no obligation to disclose the information about himself. 760 N.E.2d at 712.

*Sleeper* provides the State no help. In outlining the boundaries of the State's *Brady* obligation, the *Sleeper* court cites *Daye* in its description of the "members of the prosecution team," noting that it includes "members of [the prosecutor's] staff and ... any others who have participated in the investigation or evaluation of the case and who regularly report or with reference to the particular case have reported to [the prosecutor's] office." 760 N.E.2d at 712, *citing Daye*, 587 N.E.2d at 203.[5]

If, theoretically, only a member of the "prosecution team" is compelled to disclose *Brady* evidence, then the concept of the "prosecution team" relies wholly on context. In *Sleeper*, the psychiatrist was not a member of the prosecution team, but prosecutors and members of their staff indubitably are, as are police, when involved in the investigation and preparation of the criminal case being prosecuted. That police should be included in the concept of the "prosecution team" is highlighted in another case that the State improperly relies upon, *State v. Swanson*, 307 Minn. 412, 240 N.W.2d 822 (1976). In that case, the defendant alleged that the prosecution had failed to reveal that a Minneapolis police officer was told by a nonwitness that a "contract" to kill the defendant had been put out. The defendant alleged that this statement was material because it buttressed the defendant's reasons for originally carrying a gun. Although ultimately disagreeing that the information was material, the Supreme Court of Minnesota stated that "[w]e do ... agree ... with defendant's argument that the police detective must be viewed as a part of the

---

5. We note that the original quote from *Daye* reads: "... members of his staff and *of* any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office." It is curious that the *Sleeper* court decided to omit the second "of," in its quote, as this omission, we believe, materially changes the meaning of the phrase. 760 N.E.2d at 712.

prosecution for purposes of applying the *Brady* rule." 240 N.W.2d at 828 n. 5

In addition, this concept of the "prosecution team" supports this Court's belief that prosecutors within the same office are not excused from their *Brady* obligations. The duty, as prescribed by *Sleeper*, applies to all members of the prosecution staff.

The State cites *People v. Robinson*, presumably, because the Illinois Supreme Court declined to impute knowledge of the investigating officers to other state employees. 157 Ill.2d 68, 191 Ill.Dec. 107, 623 N.E.2d 352, 358 (1993). *Robinson*, however, while acknowledging that it would be improper to impute *per se* the knowledge of every State employee involved in a criminal case to the prosecution, elaborated:

> "[W]e believe that the imputation of such knowledge to the prosecution requires an individualized focus on the factual circumstances. Among the factors to be considered would be the reasonableness of such imputation, whether the failure to transmit such knowledge up the informational chain was inadvertent or intentional and whether any real prejudice occurred."

191 Ill.Dec. 107, 623 N.E.2d at 358.

A federal case that the State relies on, *United States v. Avellino*, further undermines the State's position.

> "The Brady obligation extends only to material evidence . . . that is known to the prosecutor. . . . An individual prosecutor is presumed, however, to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' . . . *Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to*

*adopt 'a monolithic view of government' that would 'con-demn the prosecution of criminal cases to a state of paraly-sis.' . . . Thus, in United States v. Locascio[, 6 F.3d 924 (2nd Cir. 1993)] . . . we refused to impute to the AUSAs prosecuting that action knowledge of reports prepared by FBI agents who were 'uninvolved in the investigation or trial of the defendants-appellants.' . . . In United States v. Quinn[, 445 F.2d 940 (2nd Cir. 1971)] . . . we refused to impute the knowledge of a Florida prosecutor to an AUSA in New York, rejecting as 'completely untenable [the] posi-tion that "knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor." ' "*

*Avellino*, 136 F.3d 249, 255–256 (2d. Cir.1998) (citations omit-ted) (emphasis added). While the State cites the Second Circuit opinion for the notion that knowledge of other govern-mental offices not working with the prosecutor is not imputed to the prosecutor's office, it should be remembered that the case *sub judice* involves a prosecutor within the same office. Moreover, we again read the word "prosecutor" to symbolize the prosecutor's office as an entity.

In each of the cases cited by the State, the individuals or offices sought to be included under the *Brady* obligation were not members of the prosecutor's office and qualified, or not, based on participation. Thus, we reject the State's attempt to extend the holdings of these cases further than they actually reach. These cases cannot be used to import the participation requirement into the prosecutor's office itself.

We have, in the past, imputed the knowledge of one govern-ment official to that official's entire department, but in some contexts, we might refuse to do so vicariously. *See Gatewood v. State*, 388 Md. 526, 541–542, 880 A.2d 322, 331 (2005). To decide this case in the manner the State urges would be inconsistent, for example, with our prior case law allowing probable cause to be based on the collective knowledge of the police. *Mobley and King v. State*, 270 Md. 76, 81, 310 A.2d 803, 807 (1973), *cert. denied*, 416 U.S. 975, 94 S.Ct. 2003, 40 L.Ed.2d 564 (1974); *Hopkins v. State*, 239 Md. 517, 520, 211 A.2d 831, 833 (1965); *Johnson v. State*, 238 Md. 528, 539, 209

A.2d 765, 770 (1965); *Mercer v. State,* 237 Md. 479, 483, 206 A.2d 797, 800 (1965); *Farrow v. State,* 233 Md. 526, 531–32, 197 A.2d 434, 436–37 (1964); *Carter v. State,* 18 Md.App. 150, 154, 305 A.2d 856, 858 (1973).

In *Carter,* in which a car was stolen and recovered on the same day, but the stolen car report was not also cancelled, the Court of Special Appeals held that the later arrest of an individual driving the reportedly "stolen" car was illegal, explaining, "the police department should have known that [the stolen vehicle report] was erroneous, since police officers had recovered the vehicle and tags originally reported stolen on January 10, 1969." 18 Md.App. at 154, 305 A.2d at 859. Furthermore, because the information on which the police acted was its own "outdated copy of an erroneous report of a stolen motor vehicle which the police had recovered on the same day it was taken," the arresting officer, a part of the police team, "must be charged with the knowledge that the report was, in effect, rescinded when members of the Baltimore City Police Department recovered the car shortly after it was stolen. Accordingly, the erroneous information transmitted [to the arresting officer] and on the basis of which he arrested the appellant was clearly insufficient to show probable cause." 18 Md.App. at 156, 305 A.2d at 860.

This approach towards imputing the knowledge of one police officer to the entire department was further reinforced in *Ott v. State,* 325 Md. 206, 600 A.2d 111 (1992), in which a police officer, suspicious of two people sitting in a parked car, radioed their identities to the police department for a background check. After the computer check revealed an outstanding warrant, the officer searched the car incident to arrest and discovered drugs and paraphernalia. No outstanding warrant, in fact, existed, because the bench warrant had been satisfied a month earlier, but had not been removed from the police computer. This Court determined the search was illegal, holding:

"The arresting officer had no actual knowledge that the warrant on which he arrested petitioner was no longer outstanding. In that sense, then, he acted in subjective

good faith. Nevertheless, he was chargeable with knowledge of the warrant's invalidity. Since an officer in the Sheriff's Department had previously served the warrant, that department must have known that it was outdated."
325 Md. at 219, 600 A.2d at 117.

The policy basis for our decision is simple: imputing the knowledge of any evidence held by one prosecutor to another prosecutor within the same office will, potentially, avoid problems of intentional shielding of information and the existence of artificially created circumstances in which prosecutors can "plausibly deny" having had access to any exculpatory evidence. As noted in *Swanson*, regarding a prosecutor's disclosure of exculpatory evidence during a trial as opposed to diligently investigating and disclosing such evidence to defense counsel prior to trial,

> "If a prosecutor's response, 'I told you as soon as I knew,' is accepted to permit police withholding of evidence material to guilt or punishment, police would be encouraged to withhold such evidence from prosecutors until after trial."

240 N.W.2d at 828 n. 5 (citations omitted).

It is especially important to address and anticipate this potential for abuse when pursuing equality and fairness in criminal trials. "[T]he duties of a prosecutor to administer justice fairly, and particularly concerning requested or obviously exculpatory evidence, go beyond winning convictions." *Tucceri*, 589 N.E.2d at 1220. The State has a unique role in the criminal justice process. Although it is indeed the prosecutor of all criminal charges, the State, should not just be in the business of obtaining guilty verdicts. *See, e.g., Attorney Grievance Comm'n of Maryland v. Gansler*, 377 Md. 656, 835 A.2d 548 (2003) (holding that a prosecutor has an obligation to protect not only the public interest but the innocent and to safeguard the rights guaranteed to all persons, including those who may be guilty); *Walker v. State*, 373 Md. 360, 818 A.2d 1078 (2003) (holding that prosecutors are held to even higher standards of conduct than other attorneys due to their unique role as both advocate and minister of justice). The Supreme

Court has articulated, instead, that there is a "special role played by the American prosecutor in the search for truth in criminal trials." *Strickler,* 527 U.S. at 281, 119 S.Ct. at 1948, 144 L.Ed.2d at 301–302. *See also Kyles,* 514 U.S. at 439–440, 115 S.Ct. at 1568, 131 L.Ed.2d at 509; *Bagley,* 473 U.S. at 675, n. 6, 105 S.Ct. at 3380, 87 L.Ed.2d at 490. Further, in *Berger v. United States,* the Supreme Court opined:

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935).

Accordingly, in deciding the coverage area of the *Brady* obligation, it is proper to consider the State's Attorney Office as a single entity. As the seeker of truth, the State, as prosecutor, cannot seek to insulate itself from its constitutionally mandated duty by dividing itself into pieces, thus permitting one piece to claim ignorance of the knowledge of the other pieces. Hesitant to allow for a situation in which state officials may claim lack of involvement with a case in order to limit or prevent the disclosure of exculpatory evidence, we can conceive of no reason why individuals in a prosecutor's office should be treated differently under the *Brady* standard. By enforcing a consistent standard applicable to all in the State's Attorney's Office, we believe that nondisclosures such as the one leading to this appeal will be avoided.

Courts have already held the government accountable for the avoidance of the constitutionally mandated *Brady* duty, whether through action or omission. In *United States v. Osorio*, 929 F.2d 753 (1st Cir.1991), a drug conspiracy case involving the nondisclosure by the State of a key witness's extensive drug history, the court scolded the prosecutor's office for ignoring such a clear and undebatable duty:

"Irrespective of the reasonable strategic use defense counsel made of the late disclosed impeachment material, we still confront the disquieting problem of the government's negligence in meeting its disclosure duties. We have had occasion before to comment on 'sloppy practice' in the prosecutor's office with respect to disclosures concerning the impeachable pasts of cooperating government witnesses.... The negligence here fits that pattern of practice."

929 F.2d at 755. Further,

"Neither the individual nor the institutional responsibility of government counsel may be sloughed off so easily.... 'The government' is not a congery of independent hermetically sealed compartments; and the prosecutor in the courtroom, the United States Attorney's Office in which he works, and the FBI are not separate sovereignties. The prosecution of criminal activity is a joint enterprise among all these aspects of 'the government.' And in this prosecution, 'the government' as .. ch a joint enterprise plainly did not provide known impeachment information about [the key witness] 'as soon as it became aware of it.'"

929 F.2d at 760–761.[8]

The United States Court of Appeals for the First Circuit, moreover, has held that when the State impedes, through its own lack of diligence, the defendant's right to exculpatory and impeachment evidence, such a breach of duty is egregious:

---

**8.** The Court of Appeals for the D.C. Circuit also rejected the notion that exculpatory information that was in the hands of the Metropolitan Police Department, the FBI, or DEA, rather than the U.S. Attorney's Office, somehow absolved the State of its duty. *In re Sealed Case,* 185 F.3d at 896.

"It is wholly unacceptable that the Assistant United States Attorney trying the case was not prompted personally or institutionally to seek from knowledgeable colleagues highly material impeachment information concerning the government's most significant witness until after defense counsel got wind of it independently and indirectly from another government source."

929 F.2d at 761.[9]

In *State v. Siano*, the Connecticut Supreme Court was critical of the scenario in which the State blatantly could violate its *Brady* duty without consequence. It articulated the harmful repercussions of allowing that to occur:

"[I]f the state has no responsibility ... to take affirmative steps to gain knowledge of the criminal records of its witnesses, a defendant in many instances would be placed in the anomalous position, as was the defendant here, of having to depend on the witness whom he seeks to impeach for reliable information to accomplish that impeachment.... To force the defendant to rely on the very witness he is endeavoring to impeach for an accurate account of his criminal record is illogical and would be antithetic to what the rule was intended to accomplish.... There is ... an obligation on the part of the state ... to make a reasonable affirmative effort to obtain a record of a state's witness' felony convictions and pending misdemeanor and felony charges for disclosure to the defendant. That conclusion requires that a prosecutor is at least obligated to make known to a defendant, at the proper time, information concerning the criminal record of a state's witness that is known to the prosecutor or is contained in the prosecutor's

---

**9.** The court in *United States v. Osorio*, 929 F.2d 753 (1st Cir.1991), commented that, regarding *Brady* disclosure, "[i]t is good strategy. No properly prepared trial lawyer should permit himself to be surprised by the vulnerability of his witness, particularly when that vulnerability is well known by his colleagues. To do so needlessly hands a strategic advantage to one's adversary. And it is not merely sloppy personal practice; it implicates the procedures of the entire office for responding to discovery ordered by the court." *Osorio*, 929 F.2d at 761.

own case file, information that can be gained through reasonable inquiry of other prosecutorial personnel in the prosecutor's office, and information that is reasonably available to the prosecutor through his access to state and federal computerized criminal information systems. Anything less, we believe, would compromise the effectiveness of [the State's *Brady* obligation] and in many instances would render it a nullity."

216 Conn. at 279–280, 579 A.2d at 82–83.

The State acts as one unit, and as such, declining to make a reasonable inquiry of those in a position to have relevant knowledge is appealable error.[10] It is not good enough to claim that another part of the State failed in its duty, and this failing resulted in the prosecutor being unable to fulfill his or her personal obligation. While investigative agents, for example, may be subject to some sort of punishment for their lack of diligence, "[u]ltimately, regardless of whether the prosecutor is able to frame and enforce directives to the investigative agencies to respond candidly and fully to disclosure orders, responsibility for failure to meet disclosure obligations will be assessed by the courts against the prosecutor and his office." *Osorio,* 929 F.2d at 762.

### E.

The State claims that "[d]efense counsel, having been provided with Sean Williams's criminal record, could have chosen to delve into his background in order to obtain additional impeachment information.... The due diligence

---

**10.** Some courts have treated the State like a corporation, finding the imputation of collective knowledge on its individual employees and agents when assessing individual employees and agents to be applicable in the State context. *See, e.g., Osorio,* 929 F.2d at 761, *citing United States v. Bank of New England,* 821 F.2d 844, 855 (1st Cir.1987), *cert. denied,* 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987) (finding no reason why similar principles of institutional responsibility should not be used to analyze the actions of individual government attorneys called upon to represent the government as an institution in matters of court-ordered disclosure obligations).

burden is the defendant's, not the State's."[11]   The State further argues that *Brady* does not relieve a defendant from a duty to investigate, and that, under *Ware*, 348 Md. 19, 38–39, 702 A.2d 699, 708, a *Brady* violation does not occur when the defense counsel should have known of potentially exculpatory evidence or impeachment information, and does not exercise reasonable diligence to exploit it.

We are not persuaded.   A defendant's duty to investigate simply does not relieve the State of its duty to disclose exculpatory evidence under *Brady* and Maryland Rule 4–263(g).   In *Banks v. Dretke*, the Supreme Court held, in response to a similar argument:

> "The State here … urges, in effect, that 'the prosecution can lie and conceal and the prisoner still has the burden to … discover the evidence,' … so long as the 'potential existence' of a prosecutorial misconduct claim might have been detected … A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."

---

**11.**  Although the respondent urges this Court to hold that the State waived its argument that a defendant has a duty to investigate, we note that certiorari was properly granted on the issue, and, thus, we have the authority to address it.  The State included the issue in its Petition for Writ of Certiorari, which we granted, without, it must be noted, excepting that issue.  Moreover, the respondent did not raise, by way of cross-petition, whether the duty to investigate issue had been waived.  By not himself contesting the issue and its waiver status in a cross-petition, the respondent has not preserved the issue of waiver for our review.  *See Holbrook v. State*, 364 Md. 354, 772 A.2d 1240 (2001) (Defendant failed to preserve for appellate review his claim that convictions should merge as matter of "fundamental fairness"; that argument was neither included in his petition for writ of certiorari nor argued before intermediate appellate court).  *See* Maryland Rule 8–131, detailing the scope of review of the Maryland Court of Appeals, which provides, as pertinent:

> "(b) In Court of Appeals—Additional Limitations.
> "(1) *Prior Appellate Decision.*  Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals."

540 U.S. 668, 696, 124 S.Ct. 1256, 1275, 157 L.Ed.2d 1166, 1193 (2004).

The *Banks* Court held firm that there is a presumption by courts, litigants, and juries that the State will refrain from using improper methods in order to secure convictions, and that burdens plainly resting on the State will be "faithfully observed." 540 U.S. at 696, 124 S.Ct. at 1275, 157 L.Ed.2d at 1193, *citing Berger,* 295 U.S. at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321. *See also Bracy v. Gramley,* 520 U.S. 899, 909, 117 S.Ct. 1793, 1799, 138 L.Ed.2d 97, 106 (1997) ("Ordinarily, we presume that public officials have properly discharged their official duties").

Furthermore, the authority cited by the State, *Ware,* only addresses information that could have been ascertained by defendant's counsel from public records, and, even in that instance, does not fully relieve the State of its duty:

> "Merely because evidence is available through public records, however, does not necessarily mean that it is available to the accused for purposes of determining whether the *Brady* rule applies. . . . Even when the exculpatory information can be found in public records, the necessary inquiry is whether the defendant knew or should have known facts that would have allowed him to access the undisclosed evidence. . . . Furthermore, the existence of evidence in the public record does not suffice to relieve the State of its duty to disclose material, favorable evidence to the defense unless a reasonable defendant would have looked to that public record in the exercise of due diligence."

348 Md. at 39–40, 702 A.2d at 708–709.

This case presents a more restrictive setting. Here, the undisclosed information of S. Williams's status as a paid informant could have come only from the State's Attorney's Office or the police. Where exculpatory or mitigating evidence is accessible only through the State, or with its cooperation, it simply cannot be that the defense must engage in a futile attempt to gather *Brady* information. "As a general rule, the omissions of defense counsel (a) do not relieve the

prosecution of its obligation to disclose exculpatory evidence and (b) may provide the defendant with an independent claim of an unconstitutional denial of the effective assistance of counsel." *Tucceri*, 589 N.E.2d at 1221.

F.

Lastly, the State contends that, even if *Brady* information was illegally withheld, that information was not material to the respondent's case. Again, we disagree. The analysis of the Court of Special Appeals is both on point and correct. Evidence is material under *Brady* when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. at 1566, 131 L.Ed.2d at 506. Moreover, "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." 514 U.S. at 434–435, 115 S.Ct. at 1566, 131 L.Ed.2d at 506. All that is required is a showing of a "reasonable probability of a different result." [12] *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566, 131 L.Ed.2d at 506, *citing Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381, 87 L.Ed.2d. at 491–492 (internal quotation marks omitted).

The Court of Special Appeals relied primarily on *Conyers v. State*, 367 Md. 571, 790 A.2d 15 (2002). In *Conyers*, this Court concluded that evidence was material when it provided the "only direct link between the [defendant] and the crime." 367 Md. at 613, 790 A.2d at 40. The Court of Special Appeals noted that the case *sub judice* and the circumstances in *Conyers* were very similar, in that both cases involved the State disputing whether the witness's testimony was, in reality, the "only link" between the defendant and the crime. This Court in *Conyers* rejected the State's argument, concluding:

---

**12.** Again, as we highlighted in *supra*, n. 4, the correct standard is "reasonable possibility" under *Dorsey*.

"While there was circumstantial evidence adduced during the guilt/innocence portion of the trial that would permit a reasonable jury to conclude that Petitioner was a participant in her murder, it is less apparent that, absent belief of [the government witness's] testimony, the evidence would have been sufficient to find, beyond a reasonable doubt, Petitioner was the principal. If [the government witness's] testimony is to be believed, there are no inferences that need be drawn from the circumstantial evidence, either at trial or sentencing, in order to conclude that Petitioner was involved, or the shooter, in both murders."

*Conyers*, 367 Md. at 613, 790 A.2d at 40.

The Court of Special Appeals, in relying on *Conyers*, acknowledged that the State produced some circumstantial evidence implicating the respondent; however, it was convinced that it was insufficient to sustain his conviction, that is, absent the S. Williams's, the key witness', testimony. Accordingly, it held "that the taint of the *Brady* suppression matters on this record so undermines our confidence in the murder conviction that a new trial is in order." *Williams*, 152 Md.App. at 227, 831 A.2d at 517, *citing Conyers*, 367 Md. at 613, 790 A.2d at 40.

In its brief, the State cites *Kyles* for the proposition that the mere fact that a prosecutor knows of favorable exculpatory evidence unknown to the defense is not, without more, a *Brady* violation. 514 U.S. at 437, 115 S.Ct. at 1567, 131 L.Ed.2d at 507–508. ("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense"). This proposition is taken out of context, however, and, in any event, does not fully convey the *Kyles* Court's analysis or holding.

In *Kyles*, the petitioner was convicted of first-degree murder and sentenced to death; his conviction was affirmed on direct appeal. *State v. Kyles*, 513 So.2d 265 (La.1987), *cert. denied*, 486 U.S. 1027, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988). On state collateral review, it was revealed that the State had not disclosed certain *Brady* evidence; however, the relief was

nonetheless denied.[13] *State ex rel. Kyles v. Butler,* 566 So.2d 386 (La.1990). In evaluating these circumstances, the *Kyles* Court applied the four factors enumerated in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), that determined materiality: first, that a showing of materiality does not require a demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal; second, that materiality is not determined by a sufficiency of the evidence test; third, that a *Bagley* error was not harmless error; and finally, that materiality in terms of suppressed evidence is considered cumulatively, not individually. 514 U.S. at 434–437, 115 S.Ct. at 1565–1567, 131 L.Ed.2d at 506–507, *citing Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. It is from this fourth aspect of *Bagley* materiality that the State draws its support; however, a close reading of the entire passage clarifies its meaning and that meaning does not support the State's argument:

"While the definition of *Bagley* materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.

13. The undisclosed evidence included eyewitness statements, statements given by an informant who was never called to testify, and a computer print-out of license numbers of cars parked at the crime scene on the night of the murder. The latter did not include the license number of the petitioner's car. 514 U.S. at 450, 115 S.Ct. at 1573, 131 L.Ed.2d at 516.

But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, see *Brady,* 373 U.S. at 87, 83 S.Ct. 1194), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."

514 U.S. at 437–438, 115 S.Ct. at 1567–1568, 131 L.Ed.2d at 508. In order to carry its burden, the State has a duty to seek out and disclose all favorable *Brady* evidence, and that responsibility cannot be shifted onto another party. *Kyles,* therefore, does not assist the State.

The State suggests that *Agurs* illustrates the Supreme Court's previous rejection of the notion that a prosecutor must disclose anything, and everything, that might influence a jury, commenting:

"If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice. . . . Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution does not demand that much."

427 U.S. at 109, 96 S.Ct. at 2400, 49 L.Ed.2d at 353. This passage merely touches upon the intent of the Supreme Court majority in *Agurs.* While the Supreme Court did acknowledge it could not consistently treat every nondisclosure as an error, it ultimately held that if such undisclosed evidence potentially would have affected the outcome of the trial, nondisclosure of such material or information would be constitutionally improper:

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. . . . [I]f the verdict is already of questiona-

ble validity, additional evidence of relatively minor importance might be sufficient to create reasonable doubt."

427 U.S. at 112–113, 96 S.Ct. at 2401–2402, 49 L.Ed.2d at 354–355.

Finally, the State refers to the post conviction court's finding that the respondent's cross-examination of S. Williams was "nothing short of superb," and that the witness had been sufficiently attacked. The Court of Special Appeals rejected this rationale, as do we. Relying again on *Conyers,* the Court of Special Appeals pointed out:

"Appellant's trial counsel cross-examined Williams about his criminal record and his testimony in another homicide case. Nevertheless, counsel had no direct evidence with which to cross-examine Williams as to his receipt of benefits for the information he had provided to police. For these reasons, we cannot say that, if the jury had been informed of the 'totality of the circumstances' surrounding Williams's status as a paid police informant and his attempts to have Judge Schwait reduce his sentence because of his cooperation with the police, there would be neither a substantial possibility nor a reasonable probability 'that the outcome would have been different.'"

*Williams,* 152 Md.App. at 228, 831 A.2d at 517.

We agree. The caliber of the defense counsel's performance in cross-examining the critical State's witness has little, if any, bearing on materiality. We certainly are not inclined to make the test of materiality of undisclosed evidence depend on the capability or actual performance of opposing counsel in conducting cross-examination of an adverse witness. This case addresses the duty of the State, a duty that is not discharged no matter how well a defendant's counsel handles his client's defense and how expertly he or she endeavors to neutralize damaging evidence. "In gauging the nondisclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel." *Barbee,* 331 F.2d at 846.

While it may be true that the adequacy of cross-examination may invite speculation as to whether the undisclosed evidence would have affected the outcome of the case, such speculation does not affect the ultimate question, that of the materiality of such evidence, and it certainly does not affect the duty that the State has to discharge the obligation imposed upon it by *Brady.*

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.