899 A.2d 170

Garrison THOMAS

v.

STATE of Maryland.

No. 398, Sept. Term, 2004.

Court of Special Appeals of Maryland.

May 25, 2006.

684

Geraldine K. Sweeney (Nancy S. Forster, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Panel: HOLLANDER, KENNEY and KRAUSER, JJ.

KENNEY, J.

Appellant, Garrison Thomas, was convicted of murder and robbery, and sentenced to life in prison. He presents two questions on appeal:

1. Did the trial judge err in ruling that the State had not committed a discovery violation when it disclosed to the defense counsel, *one week before the beginning of the second trial,* the existence of a statement allegedly made by Appellant to the arresting officer during processing?

2. Under the facts of this case, did the trial judge err in ruling that testimony that Appellant resisted attempts to

draw his blood was admissible as evidence of "consciousness of guilt"?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

This case arises from the murder of Beverly Renee Mitchell ("the victim") in March 1995. In June 1999, appellant was tried and convicted of the victim's murder and robbery. We affirmed his conviction in an unreported opinion. The Court of Appeals reversed, however, holding that "the trial court erred in admitting the testimony regarding petitioner's refusal to submit to blood testing to show consciousness of guilt." *Thomas v. State*, 372 Md. 342, 349, 812 A.2d 1050 (2002) (*"Thomas I"*). In February 2004, appellant was again tried and convicted of the victim's murder and robbery. The following facts were gleaned from the record of the second trial.

On March 22, 1995, Ann Porter, the victim's aunt, called Marva Mitchell, the victim's mother, from West Virginia, and asked her to bring some money to her husband, James Porter. Mitchell stopped at the Porter house in Southeast Washington, D.C., on her way home from work that evening, and told Mr. Porter that the victim would likely bring him some money that night. Appellant, who was living in the basement of the Porters' house, was present during the conversation.

The victim left her mother's house around 9:00 p.m. March 22, stating that she was going home after going to the Porters' house to give the money to Mr. Porter. According to Porter, she arrived at his house around 9:30 p.m. She woke him when she came into the house. She gave him $10, and they spoke briefly. He stated that he watched from a window as she drove away.

When the victim had not returned to her apartment by 10:00 a.m. on March 23, 1995, her roommate reported to the police that she was missing. Later that afternoon, a passerby found the victim's body in a field near a wooded area in La Plata. He reported his finding to the Charles County Sher-

iff's Office. According to Dr. James Locke, the Assistant State Medical Examiner who performed the autopsy, the victim died from "strangulation and blunt force injuries of the head." In his opinion, the manner of death was homicide.

On March 24, 1995, a woman who had heard a news story describing the victim's vehicle, a white Mitsubishi, informed the Metropolitan Police that she had seen the vehicle. She directed the police to the 1100 block of 10th Street, S.E., in Washington, D.C., where they located the car. According to Detective Robert Saunders, it appeared that someone had tried to set fire to the inside of the car, but "it was just smoked out." The inside of the car had a strong smell of gasoline, and police found a plastic jug containing liquid. A witness informed Detective Saunders that the person who had been driving the car could be found at 917 Potomac Avenue.

At that address, the police met Novella Harris. According to Harris, in the early morning hours on March 23, 1995, a man wearing a dress and a wig, and calling himself "Cookie," came to Harris's house and asked about purchasing cocaine. Harris had seen him before, but on the previous occasion he had been dressed as a man and called himself "David." Cookie had arrived in a white Mitsubishi, which he later refused to drive. Harris, Cookie, and others smoked crack cocaine throughout the day and the following night. At one point in the evening, Cookie attempted to wipe his fingerprints from the interior of the car. Concerned that he had not successfully removed his fingerprints, he decided to burn the vehicle. He and Harris went to a gas station, where he filled a plastic jug with gasoline. Later that night, Harris watched from a window as Cookie started a fire in the car and ran away from it. Shortly thereafter, she saw him throw a key on the ground, and discard a set of keys in a trash can. He left Harris's house around 8:00 a.m. on March 24. Harris directed police to the trash can, where they found a set of keys, and to a field, where they found a Mitsubishi key. It was later verified that the white Mitsubishi near Harris's house was the victim's car. Investigators discovered a hair from a wig in the

vehicle. They also found two sets of fingerprints inside. One belonged to the victim. The other could not be identified.

Detectives encountered appellant at the Porters' house on March 24, 1995, while they were interviewing James Porter. In their view, appellant fit Harris's description of Cookie. In response to police questioning, appellant said that he was alone on the evening of March 22, 1995, and that he had spent the night in a bus station. Nevertheless, there were several indications that appellant and Cookie are the same person, including Harris's identification of a photograph of appellant as "Cookie," and statements by the victim's cousin and appellant's former wife that they had seen him dressed in women's clothing. Additionally, police found an identification card on appellant's person that listed his gender as "F."

It is unclear why the police did not arrest appellant in 1995. The lead detective on the case was promoted in June 1996, and no longer worked on the investigation. In the fall of 1997, Detective Shane Knowlan of the Charles County Sheriff's Office was placed in charge of the case. He was assisted by a "Cold Case Homicide Squad" comprised of agents from the Federal Bureau of Investigation and detectives from the District of Columbia Metropolitan Police Department. According to Detective Knowlan, after he "reviewed the case file," he "felt there was some things that could be done with the case." He "[i]dentified some additional witnesses, spoke to them, got some additional information[,][r]eaddressed or re-interviewed some of the witnesses involved and examined physical evidence for possible testing." Detective Knowlan's investigation led to appellant's arrest in December 1998.

After a three-day trial in February 2004, the jury convicted appellant of first degree felony murder, second degree specific intent murder, and robbery. On February 19, 2004, the court sentenced him to life imprisonment. He noted an appeal to this Court on March 3, 2004. Additional facts will be presented as necessary in our discussion of the issues raised in this appeal.

## DISCUSSION

### I. Discovery Violation

Appellant argues that the State committed a discovery violation when it did not inform the defense until a week before the second trial of an alleged statement by appellant to a federal law enforcement officer in December 1998. Prior to the trial, appellant moved to suppress testimony by Bradley Purscell. Purscell, an FBI agent who was a member of the "Cold Case Homicide Squad," assisted in appellant's arrest in December 1998. In a pretrial hearing, he testified that after his arrest appellant engaged him in a brief exchange:

Then, as we were transporting him, and I want to say we were walking down a hallway, [appellant] asked me if I had found Jesus and if I was a Christian, to which I replied I was. He then stated to me, God has already forgiven me. And my response to him was, that's nice because the State of Maryland hasn't.

Agent Purscell testified that he did not write a report of the conversation in 1998, that he had not been subpoenaed for the first trial, and that he only informed the State's Attorney of appellant's statement shortly before the hearing:

[THE STATE]: When's the first time you spoke to a member of the State's Attorney's Office about this statement?

[PURSCELL]: I had received a subpoena back at my home station, [Flagstaff], Arizona, and I called and got the number for the State's Attorney, approximately a week ago. And that's when I was introduced to yourself.

[THE STATE]: And that's the first time you told somebody in the State's Attorney's Office about this statement?

[PURSCELL]: Correct.

According to the State, the State's Attorney's office disclosed Agent Purscell's statement to defense counsel the same day they received it.

On cross-examination, Agent Purscell acknowledged that appellant had made no reference to the charges against him,

but merely stated that God had forgiven him. Asked by defense counsel whether appellant's statements could have been an attempt to convert Agent Purscell to Christianity, he responded: "Yes. Because as I recall he was a pastor of a church which he had in his residence."

Defense counsel argued that the timing of the State's disclosure of the statement resulted in a discovery violation. The State responded that it met its obligation to promptly inform the defense of new information, and that it was within the court's discretion to allow the testimony. The court concluded:

Based on these circumstances and what I've heard, I do not find there's a discovery violation. There's no indication that this statement was known to the State prior to a week ago. There's no bad faith on the part of the State. So, as far as that goes, I find that the State promptly reported to defense counsel its intent to use the statement by [appellant].

Agent Purscell testified at trial with regard to his alleged conversation with appellant:

[THE STATE]: Now at the end of processing, did there come a time when [appellant] engaged you in what struck you as an unusual conversation?

[PURSCELL]: Yes; there was.

[THE STATE]: Tell us where that happened.

\* \* \*

[PURSCELL]: After he had been processed myself and, I believe it was an FBI agent that I was working with, in the process of transporting [appellant] from the FBI Office to the Metropolitan Police lockup; during that time [appellant] asked me if I had accepted Jesus Christ as my Lord and Savior and if I was a Christian.

[THE STATE]: Now were you asking him any questions at that point?

[PURSCELL]: No.

[THE STATE]: Who initiated that conversation?

[PURSCELL]: [Appellant] did.

[THE STATE]: And what did you respond to him?

[PURSCELL]: I replied that yes, I was.

[THE STATE]: What did he say next?

[PURSCELL]: He looked at me and stated words of the effect of God has forgiven me.

[THE STATE]: No other questions.

On cross-examination, Agent Purscell acknowledged that appellant had not made reference to the charges against him, but merely stated that God had forgiven him.

Appellant contends that, "[b]ecause the State's Attorney for Charles County had an obligation to disclose the information, [the state] had an obligation to make timely investigation to see if any statements had been made." He asserts that the circuit court "misconstrue[d]" the rules of discovery in allowing the testimony.

The State responds that the rules of discovery do not clearly require it to disclose the statement. Moreover, even if it was required to disclose the statement, the State contends that it did so promptly, as required by the rules.

█ Discovery in the circuit court is governed by Maryland Rule 4–263, which provides in pertinent part:

(a) **Disclosure without request.** Without the necessity of a request, the State's Attorney shall furnish to the defendant:

\* \* \*

(2) Any relevant material or information regarding: (A) specific searches and seizures, wire taps or eavesdropping, (B) the acquisition of statements made by the defendant to a State agent that the State intends to use at a hearing or trial, and (C) pretrial identification of the defendant by a witness for the State.

(b) **Disclosure upon request.** Upon request of the defendant, the State's Attorney shall:

\* \* \*

(2) Statements of the defendant. As to all statements made by the defendant to a State agent that the State intends to use at a hearing or trial, furnish to the defendant, but not file unless the court so orders: (A) a copy of each written or recorded statement, and (B) the substance of each oral statement and a copy of all reports of each oral statement;

\* \* \*

(e) **Time for discovery.** The State's Attorney shall make disclosure pursuant to section (a) of this Rule within 25 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4–213. Any request by the defendant for discovery pursuant to section (b) of this Rule, and any request by the State for discovery pursuant to section (d) of this Rule shall be made within 15 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4–213. The party served with the request shall furnish the discovery within ten days after service.

\* \* \*

(g) **Obligations of State's Attorney.** The obligations of the State's Attorney under this Rule extend to material and information in the possession or control of the State's Attorney and staff members and any others who have participated in the investigation or evaluation of the action and who either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney.

(h) **Continuing Duty to disclose.** A party who has responded to a request or order for discovery and who obtains further material information shall supplement the response promptly.

We review *de novo* whether a discovery violation occurred. *Cole v. State*, 378 Md. 42, 56, 835 A.2d 600 (2003).

■ Appellant argues that the State violated its discovery obligations under Maryland Rule 4–263 by failing to disclose his statement to Agent Purscell until the week before the motions hearing. Maryland Rule 4–263(a)–(b) plainly requires the State to "furnish to the defendant" information relating to "statements made by the defendant to a State agent that the State intends to use at a hearing or trial." We will focus on the Rule's requirements that the statement be one made to a "State agent," and that it be a statement "that the State intends to use at a hearing or trial." [1]

---

1. The State also contends that appellant's declaration was not a "statement" under Rule 4–263(a)–(b). The Court of Appeals has stated that "[a] principal purpose of the rule is to provide 'for the discovery of statements which might possibly have been unlawfully obtained.' " *Johnson v. State*, 360 Md. 250, 268, 757 A.2d 796 (2000) (quoting *State v. Brown*, 327 Md. 81, 92, 607 A.2d 923 (1992)). The Court has held, therefore, that admissions or confessions that could not be challenged as having been unlawfully obtained do not constitute "statements" within the rule. *Brown*, 327 Md. at 94, 607 A.2d 923.

*Brown* involved an unsolicited statement to undercover police in the course of a drug transaction. The Court of Appeals determined that the State was not obligated to disclose the statement under Maryland Rule 4–263 because it was not knowingly made to a State agent or made under circumstances that could give rise to a claim that it was unlawfully obtained:

> ... The statement made in the instant case is analogous to the statements in *Jennings* [*v. State*, 303 Md. 72, 492 A.2d 295 (1985)]. In both cases the statements were made during drug deals to persons who were not known to be State agents and who were not trying to elicit any admissions or confessions.
> There is not the slightest suggestion before this Court that [the undercover officer's] involvement in the second drug transaction was for the purpose of inducing or deliberately eliciting Brown's statement. Rather, Brown voluntarily made the statement under circumstances involving no interrogation or coercion. Brown, therefore, did not and could not contend that his statement was acquired in violation of his Fourth, Fifth, or Sixth Amendment rights. We can find no reason to compel the State to produce a statement voluntarily made to an undercover officer during a drug transaction merely because it occurred after the crime for which the defendant was charged. Consequently, Brown's statements ... are not discoverable under Md. Rule 4–263(a)(2)(B) and (b)(2).

*Brown*, 327 Md. at 94–95, 607 A.2d 923.

■ Maryland Rule 4–263(g) clarifies that the disclosure requirement applies to any statement that is "in the possession or control of the State's Attorney and staff members and any others who have participated in the investigation or evaluation of the action and who either regularly report, or with reference to the particular action have reported, to the office of the State's Attorney." The State's Attorney is clearly "accountable" for information known to police officers who meet the requirements of the Rule. *Williams v. State,* 364 Md. 160, 177, 771 A.2d 1082 (2001). *See also Robinson v. State,* 354 Md. 287, 304, 730 A.2d 181 (1999) (stating that, under *Jencks*[2] and *Carr,*[3] a prosecutor is responsible for " 'all seemingly pertinent facts related to the charge which are known to the police department who represent the local subdivision that has jurisdiction to try the case' ") (quoting *State v. Giles,* 239 Md. 458, 470, 212 A.2d 101 (1965), *rev'd on other grounds,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967)). The Court of Appeals has determined that the State's discovery obligations extend to information known to a representative of another sovereign. *Bailey v. State,* 303 Md. 650, 496 A.2d 665 (1985). "Otherwise, the purpose of [Maryland Rule 4–263] is defeated where agents of a sovereign, other than Maryland, have been involved in investigating the case." *Id.* at 656, 496 A.2d 665. In *Bailey,* the Court held that the State was required to

---

In the present case, although Agent Purscell testified that appellant initiated the conversation, and he did so without having been threatened or induced, there are facts that distinguish this case from *Brown.* According to Agent Purscell, appellant made the statement after he had been arrested and after an interview with police in which he "was not very cooperative." Appellant spoke to Agent Purscell as he was being transported to "lock-up" by Purscell and other officers present at the interview. Appellant was clearly aware that he was speaking to a government agent, and he could conceivably have challenged whether the statement was lawfully obtained. His declaration was a "statement" under Maryland Rule 4–263(a)–(b).

**2.** *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

**3.** *Carr v. State,* 284 Md. 455, 397 A.2d 606 (1979).

disclose information relating to statements made by Bailey to a New Jersey State Trooper. *Id.* at 655, 496 A.2d 665.

■ Nevertheless, Maryland Rule 4–263(g) applies to an investigator who "regularly report[s]" to the State's Attorney's office, or who "ha[s] reported" "with reference to the particular action." As an FBI agent, Purscell clearly did not "regularly report" to the State's Attorney. Moreover, he did not report with respect to this case until he contacted the State's Attorney's office shortly before the pretrial hearing. He testified that he "was never subpoenaed for the first trial," and that, after he received a subpoena for the second trial, he "called and got the number for the State's Attorney" and informed the State of appellant's alleged statement. Thus, statements made by appellant to Agent Purscell did not fall within the State's disclosure obligation until Purscell first "reported" to the State's Attorney.

With respect to the State's intention to use the statement at trial, *Armstrong v. State*, 69 Md.App. 23, 515 A.2d 1190 (1986), is helpful to our analysis. In *Armstrong*, the defendant had been released on bail prior to his trial on charges of possession of marijuana and unlawful possession of a handgun. In an "apparently chance encounter" with a police officer, Armstrong admitted that the gun in question belonged to him. *Id.* at 31–32, 515 A.2d 1190. The officer did not inform the prosecutor of the statement until the morning of the suppression hearing, at which time the prosecutor disclosed the statement to defense counsel. *Id.* at 32, 515 A.2d 1190. At the hearing, Armstrong argued that the State's late disclosure of the statement constituted a violation of Maryland Rule 4–263. The trial court ruled that there had been no violation, and the statement was admitted into evidence at Armstrong's trial.

On appeal, we determined that, although disclosure was required pursuant to Rule 4–263(b)(2), "it is not at all clear in the first instance that there *was* a discovery violation." *Id.* at 32, 515 A.2d 1190. We noted that "[t]he State's Attorney informed the court that he first learned about the conversation

with [the officer] that very morning and that he disclosed it to defense counsel within 10 minutes," and reasoned that "[h]e obviously could not have intended to use the statement before he knew of it." *Id.* at 32–33, 515 A.2d 1190. We further concluded that, even if the State's disclosure was a violation of the Rule, the trial court had not abused its discretion in refusing to suppress the evidence.

In this case, the State was not aware of appellant's statement to Agent Purscell until Purscell telephoned the State's Attorney. The State could not have intended to use the statement at trial until the day it learned of the statement.

█ In our view, under the circumstances of this case, the timing of the State's discovery obligation is governed by Maryland Rule 4–263(h): "A party who has responded to a request or order for discovery and who obtains further material information shall supplement the response promptly." We view the State's disclosure of the statement the same day that it learned of it as sufficiently prompt.

Appellant also asserts that the State "had an obligation to make timely investigation to see if any statements had been made." Echoing the appellant's argument in *Williams v. State,* 152 Md.App. 200, 831 A.2d 501, *aff'd, State v. Williams,* 392 Md. 194, 896 A.2d 973 (2006) (filed April 14, 2006), appellant states that " '[w]ilful blindness by the State of its discovery obligations' should not excuse a lack of due diligence." He contends that, because the statement was in the possession of an investigator long before it was disclosed to the defense, the State violated the timing requirements of Maryland Rule 4–263(e).

In *Williams,* a jailhouse snitch testified at trial that Williams had confessed to the murder for which he was later convicted. The State had informed the defense that the informant had received nothing in return for the information, and the informant so testified at trial. Later, it was determined that the informant was a paid informant of the Baltimore City Police. His status as a paid informant was known to other members of the State's Attorney's office and police

detectives not involved with Williams's case. On appeal, we concluded that the State's failure to disclose the informant's status as a paid informant constituted a *Brady*[4] violation.

The Court of Appeals affirmed our decision in *Williams,* holding that "the disclosure obligation imposed by *Brady* does, in fact, apply to information possessed by other prosecutors in the same office." *Williams,* 392 Md. at 211, 896 A.2d 973. In addressing Maryland Rule 4–263(g), the Court observed:

> [I]t is clear from the language used by the rule that the obligations of the State's Attorney to disclose encompasses three groups: [1] the State's Attorney, [2] his or her staff members, and [3] those who are not either of the foregoing, but who have participated, or are participating, in the case itself, by, for example, participating "in the investigation or evaluation of the action," regularly reporting to the State's Attorney's Office, or, with respect to the case under review, have reported to the State's Attorney's Office.

*Id.* at 208, 896 A.2d 973 (quoting Maryland Rule 4–263(g)). The Court concluded that the prosecutor is responsible for disclosing discoverable material in the possession of other members of the State's Attorney's Office, but not necessarily information in the possession of those outside the State's Attorney's Office:

> We hold that by referring only to the "State's Attorney and staff members," without any restriction, and then including "any others," restricted to those with a direct present or past involvement with the particular action, Rule 4–263(g) draws a distinction between the State's Attorney's Office and those outside the Office who are on the prosecution team.

*Williams,* 392 Md. at 209–10, 896 A.2d 973.

The case before us does not involve information in the possession of an attorney or staff member within the State's Attorney's Office, but, rather, information possessed by a

---

4. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

member of a law enforcement agency outside of the State's Attorney's Office who does not regularly report to that office. Thus, the State did not have an obligation to disclose the information provided by Agent Purscell until he first "reported" to the State's Attorney, and the State's Attorney first "intended" to use the statement at trial. When that happened, the disclosure was "promptly" made. Md. Rule 4–263(b)(2), (g), (h).

Appellant directs us to *Williams v. State*, 364 Md. 160, 771 A.2d 1082 (2001), which involved the requirement of Maryland Rule 4–263(a)(2)(C) that the State disclose information relating to a "pretrial identification of the defendant by a witness for the State." The State had proffered that a police officer could describe the physical features of a person he saw at the crime scene, but could not identify Williams. The trial court allowed the officer's testimony. At trial, however, the officer identified Williams as the person at the scene.

The Court of Appeals held that the Rule applies to a pretrial identification by a police officer, and therefore the State was required to disclose the officer's identification of Williams. The Court further determined that the State's ignorance of the officer's identification of Williams did not relieve it of its disclosure obligation:

> We cannot allow the State to be the recipient of the unquestionable windfall that resulted from its own clear violation of the discovery rules. Contrary to the conclusions of the trial judge, "surprise" does not excuse or mitigate the prejudice to the defendant....

> [Maryland Rule 4–263(g) ] clearly articulates that the State's Attorney was accountable for information held by [the officer], as he both "participated in the investigation" and "reported to the office of the State's Attorney." ... Therefore, whether the inaccurate representation was a result of willful aforethought or inadvertence is irrelevant because the determination of a discovery violation does not mandate inquiry into a party's mental state.

Nor is the effect of the inaccurate representation neutralized simply because the State's Attorney may have lacked foreknowledge of the ultimate testimony. . . .

If the State's Attorney's lack of knowledge could excuse, or even mitigate the prejudicial effect of the undisclosed information, States' Attorneys would most effectively operate in a vacuum because, by removing themselves from the privity of police testimony and evidence, States' Attorneys could slip beyond the grasp of discovery rules by claiming ignorance, and thereby force the defendant to enter trial unaware of the evidence to be offered against him. This is intolerable and totally adverse to one of the avowed purposes for the discovery rules: *to assist the defendant in preparing his defense and prevent unfair surprise at trial.*

*Williams,* 364 Md. at 176–78, 771 A.2d 1082 (footnote omitted).

In *Williams,* the Court of Appeals determined that the officer's identification of Williams fell within the State's discovery obligations because the officer had "both 'participated in the investigation' and 'reported to the office of the State's Attorney.' " *Id.* at 177, 771 A.2d 1082 (quoting Md. Rule 4–263(g)). Hence, the State's failure to disclose the identification was a violation of its discovery obligations. The State's lack of diligence resulted in a State "windfall" and "surprise" to the defendant at trial. Here, we find no discovery violation. It was not until Agent Purscell informed the State of appellant's statement that the State became obligated to disclose the information to the defense, and it complied with that obligation promptly in accordance with Maryland Rule 4–263.

## II. *Evidence of Refusal to Provide a Blood Sample*

Next, appellant raises the same issue that resulted in the reversal of his first conviction—that the circuit court erred in admitting evidence of his initial refusal to provide a blood sample to police. In the pre-trial motions hearing, Detective Sergeant Shane Knowlan testified that, in June 1998, when the case was still under investigation, police obtained a search warrant authorizing them to collect blood, saliva, and hair samples from appellant. He stated that when they attempted

to obtain the blood sample, appellant "refused to voluntarily give them. We had to basically hold him down and collect the samples." When police needed to get a second sample, however, appellant's "response was we were just going to hold him down and take it anyway, so he gave it to us [willingly]."

Appellant argued, *inter alia,* that Detective Knowlan's testimony did not raise an inference that he had resisted to conceal evidence or because of a consciousness of guilt, and that the prejudicial effect of the evidence substantially outweighed its probative value. The court decided to reserve its ruling on appellant's motion to suppress, stating, "I want to hear the testimony that actually comes out of trial."

Detective Knowlan testified at trial with regard to the blood sample:

[THE STATE]: And ultimately you got a search warrant?

[KNOWLAN]: Yes.

[THE STATE]: Signed by a judge?

[KNOWLAN]: Yes.

[THE STATE]: And as far as the person of [appellant] go—was concerned, what did that authorize you to do?

[KNOWLAN]: Collect hair, saliva, blood, just DNA and physical evidence from him.

[THE STATE]: And when did you try to [e]ffect that search warrant?

[KNOWLAN]: That was in June of 1998. June 26th, I believe.

[THE STATE]: And was [appellant] found related to that search warrant?

[KNOWLAN]: Yes.

[THE STATE]: And tell us what conversation you had with [appellant] about that search warrant.

[KNOWLAN]: When I made contact with [appellant], he was in an interview room at the Cold Case Homicide Unit in Washington, D.C., their headquarters building.

I entered a room in an attempt to gain cooperation in obtaining the samples from him. I explained the search

warrant that was in reference to [the victim's] death and that I was investigating that now. That the search warrant was signed by a judge and he was legally bound to give us these items. Voluntary would be my choice, but we would have to take them forcibly if not.

[THE STATE]: Did you tell him explicitly which case you were working on?

[KNOWLAN]: Yes.

[THE STATE]: And you told him what?

[KNOWLAN]: I told him this was in reference to [the victim's] death.

[Objection by defense counsel.[5]]

[THE STATE]: All right, Sergeant, you told him that the judge had authorized it, you preferred cooperation but if he didn't cooperate, what?

[KNOWLAN]: That we would basically forcibly take those items.

[THE STATE]: What happened?

[KNOWLAN]: When I explained it to him, again, I tried to lay it out as simply as possible that you can either voluntarily give them to us or we will take them. His remark to me was you ain't getting them. So I stepped out of the room briefly and reentered the room with several other detectives

---

**5.** The State reminded the court that it had reserved its ruling on appellant's motion to suppress. Asked the basis for appellant's objection, counsel replied: "I have to figure out what I said at motions now." She then incorporated and adopted appellant's arguments in the motions hearing. The court stated: "I'm going to allow the testimony based upon that piece (unintelligible) as far as prejudicial (unintelligible)." To which defense counsel responded: "Okay. And can I have a continuing objection to his blood resistance issue?" The court answered: "Absolutely."

Appellant therefore raised before the trial court the issues that he now argues on appeal—that the evidence did not support inferences of intent to conceal evidence or consciousness of guilt, and that the prejudicial effect substantially outweighed the probative value. Although the court referred to only the prejudice prong, an issue is preserved for our review if "it plainly appears by the record to have been raised in or decided by the trial court." Md. Rule 8–131(a). The State does not argue non-preservation.

and FBI agents. And basically held [appellant] while a forensic nurse that we had brought with us collected those items.

[THE STATE]: What happened when you tried to hold him down?

[KNOWLAN]: We eventually handcuffed him and he was struggling. We took him to the ground and we actually took the blood from a vein in his forearm while he was still handcuffed.

[THE STATE]: Who took the blood? A cop?

[KNOWLAN]: No.

The forensic nurse examiner, Don Penitser was his name.

[THE STATE]: Is this somebody who's licensed to practice nursing?

[KNOWLAN]: Correct.

It was somebody that works with us here in Charles County, we brought with us.

[THE STATE]: So after that first sample was taken, what happened?

[KNOWLAN]: The forensic nurse realized that the blood vial that was used had an expiration date that had passed. And he brought that to my attention. We were in the headquarters building of D.C. Police. They have an evidence lab on, I believe the sixth floor, and had a valid blood vial there. We obtained a new blood vial and then approached [appellant] with the request to take another blood vial.

[THE STATE]: What happened?

[KNOWLAN]: I explained, again, that the expiration date was bad. I believe the forensic nurse examiner spoke briefly about the same issue, about the blood vial being expired, that he didn't think it was going to be a problem, but we wanted to have the most accurate evidence collected.

So, again, I requested again can we take this voluntarily or not.

[THE STATE]: What happened?

[KNOWLAN]: He responded that if I don't agree you'll just hold me down and take it anyway, so he complied at that point.

[THE STATE]: Did you take other samples from him?

[KNOWLAN]: Yeah.

Hair, I believe, or at least attempted. He had an almost shaved head at that point.

[THE STATE]: Did he give you any further difficulties?

[KNOWLAN]: No.

As to whether appellant's conduct demonstrates a consciousness of guilt, the court instructed the jury as follows:

You have heard evidence that [appellant] may have attempted to suppress evidence in this case. Such conduct is not enough by itself to establish guilt but may be considered as evidence of guilt. It may be motivated by a variety of factors some of which are fully consistent with innocence.

You must first decide whether [appellant] attempted to suppress evidence in this case. If you find that [appellant] attempted to suppress evidence in this case, then you must decide whether this action shows a consciousness of guilt.

In closing argument, the State contended that appellant resisted the blood test "because he thinks there is something" in the blood sample that would connect him to the crime. The State noted that, at the time the police obtained the sample, it was not known that it would come back negative, and argued that "innocent people don't" fight the police in resistance to a request for a blood sample. Defense counsel countered that appellant was indignant that the police wanted a blood sample because he had previously cooperated with their investigation and it had been three years since the murder. The defense also pointed out that appellant complied with the police request after his initial resistance, and that the blood test ultimately did not connect him to the crime.

Appellant argues that the evidence of his initial refusal to cooperate with police should have been excluded because it does not support inferences of a desire to conceal evidence or

consciousness of guilt. In addition, he argues that the probative value of the evidence was substantially outweighed by the potential for unfair prejudice.

Detective Knowlan's testimony was properly admitted only if it was relevant. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401. Generally, "all relevant evidence is admissible. Evidence that is not relevant is not admissible." Md. Rule 5–402. "Determination of relevancy ordinarily is left to the sound discretion of the trial court, but may be reversed upon clear showing of an abuse of discretion." *Martin v. State,* 364 Md. 692, 705, 775 A.2d 385 (2001).

In *Thomas I,* the Court of Appeals explained the law regarding the relevance of the testimony at issue in this case:

A person's behavior after the commission of a crime may be admissible as circumstantial evidence from which guilt may be inferred. This category of circumstantial evidence is referred to as "consciousness of guilt." ... Conduct typically argued to show consciousness of guilt includes flight after a crime, escape from confinement, use of a false name, and destruction or concealment of evidence.

A person's post-crime behavior often is considered relevant to the question of guilt because the particular behavior provides clues to the person's state of mind. The reason why a person's post-crime state of mind may be relevant is because, as Professor Wigmore suggested, the commission of a crime can be expected to leave some mental traces on the criminal.

Applying our accepted test of relevancy, "guilty behaviour should be admissible to prove guilt if we can say that the fact that the accused behaved in a particular way renders more probable the fact of their guilt." As is the nature of circumstantial evidence, the probative value of "guilty behavior" depends upon the degree of confidence with which certain inferences may be drawn....

* * *

The relevance of the evidence [in this case] as circumstantial evidence of petitioner's guilt depends on whether the following four inferences can be drawn: (1) from his resistance to the blood test, a desire to conceal evidence; (2) from a desire to conceal evidence, a consciousness of guilt; (3) from a consciousness of guilt, a consciousness of guilt of the murder of [the victim]; and (4) from a consciousness of guilt of the murder of [the victim], actual guilt of the murder.

*Thomas,* 372 Md. at 351–56, 812 A.2d 1050 (citations omitted).

 Generally, "once an appellate court rules upon a question presented on appeal, litigants and lower courts become bound by the ruling, which is considered to be the law of the case." *Scott v. State,* 379 Md. 170, 183, 840 A.2d 715 (2004) (footnote omitted). Moreover, "[n]ot only are lower courts bound by the law of the case, but '[d]ecisions rendered by a prior appellate panel will generally govern the second appeal' at the same appellate level as well.' " *Id.* at 184, 840 A.2d 715 (quoting *Hawes v. Liberty Homes,* 100 Md.App. 222, 231, 640 A.2d 743 (1994)). The State argues that appellant is precluded from raising this issue by the doctrine of law of the case. We disagree.

Appellant's appeal from his first conviction resulted in a reversal by the Court of Appeals because there was insufficient evidence in the record from which the jury could have drawn the third required inference. The Court determined that Knowlan had "never testified as to what, if anything, police told petitioner as to the reason why they wanted his blood. Moreover, the State never entered the search warrant into evidence." *Thomas,* 372 Md. at 357, 812 A.2d 1050. Thus, the jury could not have drawn the required inference, "from a consciousness of guilt, a consciousness of guilt of the murder of [the victim]." *Id.* at 356, 812 A.2d 1050.

Appellant now argues that there is insufficient evidence from which the jury could have drawn the first inference, "from his resistance to the blood test, a desire to conceal

evidence," or the second inference, "from a desire to conceal evidence, a consciousness of guilt." *Id.* at 356, 812 A.2d 1050. The Court of Appeals did not consider these issues in the first case. It stated:

> It is the ... third prong, from consciousness of guilt to consciousness of guilt concerning the crime charged, that in the instant case is particularly important.... The question in this case is whether the evidence of petitioner's refusal to submit to the drawing of his blood was connected sufficiently with the murder charge and whether its probative value was outweighed by any unfair prejudicial effect.

*Id.* at 354, 356, 812 A.2d 1050. The Court did not address whether there was sufficient evidence from which the jury could have drawn the other three required inferences.

▇ We begin with appellant's contention that evidence of his resistance does not support an inference of "a desire to conceal evidence." *Id.* at 356, 812 A.2d 1050. He argues that his reaction to attempts by the police to collect the blood sample "is subject to more than one interpretation that would be consistent with innocence." Specifically, he suggests that his conduct could have been the result of "fear, concern for health, or religious scruple," or anger at the timing and manner in which the police had "invad[ed] the privacy of his house and person." He also notes that the blood sample did not connect him to the murder.

▇ In *Thomas I,* the Court discussed the four inferences necessary to establish the relevance of evidence of flight, as stated in *United States v. Myers,* 550 F.2d 1036 (5th Cir.1977). These inferences constitute a step-by-step inferential process beginning with the defendant's conduct to his actual guilt of the crime. The first, most elementary inference is "from the defendant's behavior to flight." *Myers,* 550 F.2d at 1049. Flight does not necessarily connect the defendant to the crime in any way; it merely establishes that he was aware of the crime or the police investigation, and that he consciously "ran away." As commentators have noted:

> It is one thing when a person suddenly turns and runs or drives off in reckless haste when accosted by law enforcement officers who make their identity known and advise him he is under arrest. It is quite another thing when the evidence shows only that the accused was discovered in another jurisdiction sometime after the crime, or that he had made plans to depart or was hard to find or late returning home, or reluctant to face police.

1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 85 (2d ed. 1994 & Supp.2004) (footnotes omitted). Patently, the difference is that in the first example, the evidence supports the inference that the suspect consciously sought to avoid the police, i.e., flight. In the other examples, the evidence does not support such an inference. The inference of flight does not conclusively connect the defendant to the crime, but is merely the first step in the inferential process of connecting his actions to his guilt of the crime. *Myers*, 550 F.2d at 1049 (stating that the first step is an inference "from the defendant's behavior to flight," and the final step is an inference of the defendant's "actual guilt of the crime charged").

In *Snyder v. State*, 361 Md. 580, 596, 762 A.2d 125 (2000), the Court of Appeals applied the four-part *Myers* test to a defendant's failure to inquire into the status of the investigation of his wife's murder for seven years after her death. The Court stated that the first prong required an inference "from the failure to inquire, satisfaction of the case not being solved or actively pursued." *Snyder*, 361 Md. at 596, 762 A.2d 125. The Snyder Court ultimately held that the failure to inquire was "too ambiguous and equivocal" to support any of the inferences. The Court reasoned, *Id.:*

> At best, the admission of the evidence invites the jury to speculate. The jury is asked to presume that the petitioner's failure to inquire is probative of the absence of a loving relationship between the petitioner and his wife.... These assumptions and speculations lack probative value where, as in this case, the State has presented no testimony or evidence, from the investigating authorities or any other

source, either as to the general response of family members during a murder investigation or of any specific responses or types of inquiries made by members of the Snyder family in this particular case. Moreover, the State presented no evidence that the petitioner was requested by the authorities to inquire regularly and certainly, it produced no evidence that the petitioner voluntarily stated that he would regularly inquire.

In *Thomas I*, the Court stated that the first prong of the relevance test requires an inference "from [appellant's] resistance to the blood test, a desire to conceal evidence." *Thomas*, 372 Md. at 356, 812 A.2d 1050. "Evidence" is "[s]omething (including testimony, documents and tangible objects) that tends to prove or disprove the existence of an alleged fact." *Black's Law Dictionary* 576 (7th ed.1999). Thus, the first prong of the test can be satisfied if the jury could infer from appellant's resistance a desire to conceal his blood from use by the police in their investigation. To have such a desire, appellant would have to be aware that the police sought the blood sample "to prove or disprove the existence of an alleged fact," in this case, that they wanted a sample of his blood to tie him to the victim's murder. The inference might be impermissible if, as appellant now suggests, his resistance was not based on his desire to conceal the blood, but, rather, was the result of some other motive, such as fear, anger, or religious belief.

Based on the circumstances, the jury could have properly inferred a desire to conceal evidence. Detective Knowlan's testimony established that appellant was made aware that the police sought the blood sample in conjunction with their investigation of the victim's murder. Appellant was very familiar with the case, as he had been personally acquainted with the victim and her family, and the police had interviewed him several times as part of their investigation. Moreover, Detective Knowlan testified that the police informed appellant that they had a warrant permitting them to collect the sample, and that if he did not comply, they would obtain the sample by

force. Nevertheless, appellant stated "you're not getting them," and physically resisted the drawing of his blood.

Appellant's contention on appeal is that he could have resisted for any one of a number of innocent reasons. That argument relates to the second prong of our analysis. Appellant's knowing resistance to police requests for a blood sample is sufficient to allow the jury to infer from his conduct a desire to conceal evidence.

We turn, then, to the question of whether the evidence of appellant's conduct was sufficiently connected with a consciousness of guilt to satisfy the second prong of the relevancy test.[6] In most of the cases that have addressed the issue, our appellate courts have affirmed the admission of evidence introduced to support an inference of consciousness of guilt. We have considered the refusal to comply with lawful requests in a police investigation in other factual situations.

In *Marshall v. State*, 85 Md.App. 320, 583 A.2d 1109 (1991), we addressed the fact that Marshall had shaved his pubic hair after he was arrested on rape charges. It was unclear whether he did so before or after the court order that he provide a pubic hair sample, but he had claimed that his purpose was to protect himself from lice in jail. We stated that "[i]t is well settled that evidence of conduct of the accused subsequent to a criminal charge is admissible if relevant to prove a consciousness of guilt. . . . Interference with police investigation is recognized as conduct which may evidence a consciousness of guilt." *Id.* at 324, 583 A.2d 1109. We concluded that, although "such evidence is not conclusive of the accused's 'guilt in and of itself, . . . it is one of the factors to be considered in establishing guilt and consciousness of guilt.' " *Id.* at 325, 583 A.2d 1109 (quoting *Bedford v. State*, 317 Md. 659, 664, 566 A.2d 111 (1989)).

---

6. Although appellant does not clearly argue that the second inference identified in *Thomas I* was not satisfied, he contends that the evidence does not support an inference of "consciousness of guilt."

In *Myers v. State*, 48 Md.App. 420, 427 A.2d 1061 (1981), we affirmed the admission of testimony by a police officer that Myers had resisted being fingerprinted after his arrest. We stated that " '[v]arious modes of conduct have been held to be tacit admissions or evidence of the consciousness of guilt,' " including " 'the refusal to provide an exemplar for comparison purposes.' " *Id.* at 424, 427 A.2d 1061 (quoting *Sewell v. State,* 34 Md.App. 691, 695, 368 A.2d 1111 (1977)).

Federal courts have also held that resistance to police requests for evidence could support an inference of consciousness of guilt. *See United States v. Jackson,* 886 F.2d 838, 846 (7th Cir.1989) (stating that "evidence of the defendant's refusal to furnish writing exemplars, like evidence of flight and concealment, is probative of consciousness of guilt"); *United States v. Terry,* 702 F.2d 299, 313–14 (2d Cir.1983) (holding that evidence that defendants refused to permit investigators to obtain palm prints was admissible to show consciousness of guilt). Appellate courts in sister states have held that evidence of the refusal to provide a blood sample is admissible to support an inference of consciousness of guilt. *California v. Farnam,* 28 Cal.4th 107, 121 Cal.Rptr.2d 106, 47 P.3d 988, 1022 (2002) (stating that evidence that the defendant initially resisted providing blood and hair samples, despite a court order that he do so, was admissible to show consciousness of guilt); *Illinois v. Edwards,* 241 Ill.App.3d 839, 182 Ill.Dec. 428, 609 N.E.2d 962, 966 (1993) (stating that "Defendant's initial refusal to submit to blood testing has some tendency to indicate a consciousness of guilt and is therefore relevant and generally admissible").

The Court in *Thomas I* confirmed that "evidence of consciousness of guilt has long been allowed as evidence in the courts of this State and universally is admitted in courts around the country." *Thomas,* 372 Md. at 353, 812 A.2d 1050. The Court noted, however, that "courts have nonetheless recognized the danger with respect to this category of evidence and increasingly have become cautious in evaluating it. Several cases seem to recognize such evidence as potentially unreliable and unfairly prejudicial." *Id.* at 353–54, 812 A.2d

1050 (citing *United States v. Howze*, 668 F.2d 322, 324 (7th Cir.1982); *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977); *Miller v. United States*, 320 F.2d 767, 770 (D.C.Cir. 1963); *Weaver v. Alabama*, 678 So.2d 284 (Ala.1996); *Louisiana v. Lee*, 381 So.2d 792 (La.1980); *Vermont v. Onorato*, 171 Vt. 577, 762 A.2d 858, 859 (2000)). The *Thomas I* Court observed that the Supreme Court of the United States has said: " '[W]e have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime.' " *Thomas*, 372 Md. at 354, 812 A.2d 1050 (quoting *Wong Sun v. United States*, 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

In *Snyder, supra,* the Court stated that, to be relevant, the evidence would have to support the second inference, "from the satisfaction of the case [of Snyder's wife's murder] not being solved or actively pursued, a consciousness of guilt." *Snyder*, 361 Md. at 596, 762 A.2d 125. The Court determined that the evidence was "too ambiguous and equivocal to support [the required] inferences." The Court reasoned that, "[a]t best, the admission of the evidence invites the jury to speculate." *Id.* The State had presented no evidence as to how family members generally respond to murder investigations or how other family members responded in this case, or that they had requested that Snyder inquire about the investigation or that he had promised to do so. Under those circumstances, the Court held that it was improper to permit the jury to assume "that the petitioner's failure to inquire is indicative of a guilty conscience." *Id.*

In *Connecticut v. Jones*, 234 Conn. 324, 662 A.2d 1199 (1995), a case relied upon by appellant, the Court held that evidence that Jones refused to submit blood, hair, and saliva samples did not support an inference of consciousness of guilt.

Under the facts and circumstances of this case, where the defendant, on the basis of his religious beliefs, and with some success, took proper advantage of our legal process to challenge the state's efforts to compel the taking of nontestimonial evidence, where the defendant allowed [an investigator] to take the evidence without the need to use physical

compulsion and where the results of the tests on the evidence have absolutely no probative value of the defendant's guilt, the court may not instruct the jury that it may draw the inference that the defendant's conduct is evidence of a guilty conscience.

*Id.* at 1216.

We believe that the facts in *Snyder* and *Jones* differ in important ways from the facts before us. In *Snyder,* the defendant did nothing to thwart the investigation. In *Jones,* the evidence supported a religious basis for the defendant's refusal, and he provided the evidence without the need for physical force. The defense in *Jones* did not rest solely on the fact that the results of the tests were not probative of defendant's guilt. To be relevant, it is not necessary that evidence of this nature conclusively establish guilt. *Thomas,* 372 Md. at 351, 812 A.2d 1050. The proper inquiry is whether the evidence *could* support an inference that the defendant's conduct demonstrates a consciousness of guilt. *Id.* at 356, 812 A.2d 1050. If so, the evidence is relevant and generally admissible. *Id.*

In this case, appellant was familiar with the crime under investigation. Detective Knowlan testified that he explained to appellant that the investigators had a warrant based on their investigation of the victim's murder. According to Detective Knowlan, appellant simply stated, "you ain't getting them," and police had to take the first blood sample by force.

Knowlan's testimony as to statements by appellant regarding his religious beliefs is as follows:

[DEFENSE COUNSEL]: When the arrest took place, do you remember [appellant] talking at all about his religious background?

[KNOWLAN]: During the arrest and during the search warrant I heard some very brief generalized comments about religion or God or something to that [effect], but nothing specific.

[DEFENSE COUNSEL]: And did you put any of these in conversation notes that you made to put in the case file?

[KNOWLAN]: No.

Again, there was nothing specific and it just didn't seem relevant at the time.

[DEFENSE COUNSEL]: Did any of the other, either agents or officers on the scene at the time of the arrest, report to you that [appellant] had made certain statements?

[KNOWLAN]: No.

[DEFENSE COUNSEL]: No further questions.

Although there may be innocent reasons, including religious reasons, why a suspect might resist a blood test, there is no clear evidence that appellant resisted a blood test for a religious reason. Consequently, the court was not required to withhold the evidence from the jury. It was therefore not an abuse of discretion for it to admit the evidence and instruct the jury that, "[i]f you find that [appellant] attempted to suppress evidence in this case, then you must decide whether this action shows a consciousness of guilt."

 Finally, appellant contends that, even if the evidence was relevant, the unfair prejudice of the testimony outweighed its probative value. He complains that "[t]he violent image of five officers holding down appellant in order to take his blood may have led the jury to believe that Appellant was a violent person capable of this brutal murder."

Under Maryland Rule 5–403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." "This inquiry is left to the sound discretion of the trial judge and will be reversed only upon a clear showing of abuse of discretion." *Malik v. State,* 152 Md.App. 305, 324, 831 A.2d 1101 (2003).

The testimony of appellant's resistance to the taking of a blood sample was relevant to support an inference of his consciousness of guilt. In our view, any possible prejudicial effect of appellant's struggle to avoid the drawing of blood did not so clearly outweigh the probative value of the evidence so as to render the circuit court's admission of the evidence an abuse of discretion.

714

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.